*817 Justice Scalia
delivered the opinion of the Court.
These cases require us to determine when statements made to law enforcement personnel during a 911 call or at a crime scene are “testimonial” and thus subject to the requirements of the Sixth Amendment’s Confrontation Clause.
I
A
The relevant statements in Davis v. Washington, No. 05-5224, were made to a 911 emergency operator on February 1, 2001. When the operator answered the initial call, the connection terminated before anyone spoke. She reversed the call, and Michelle McCottry answered. In the ensuing conversation, the operator ascertained that McCottry was involved in a domestic disturbance with her former boyfriend Adrian Davis, the petitioner in this ease:
“911 Operator: Hello.
“Complainant: Hello.
“911 Operator: What’s going on?
“Complainant: He’s here jumpin’ on me again.
“911 Operator: Okay. Listen to me carefully. Are you in a house or an apartment?
“Complainant: I’m in a house.
“911 Operator: Are there any weapons?
“Complainant: No. He’s usin’ his fists.
“911 Operator: Okay. Has he been drinking?
“Complainant: No.
“911 Operator: Okay, sweetie. I’ve got help started. Stay on the line with me, okay?
“Complainant: I’m on the line.
*818 “911 Operator: Listen to me carefully. Do you know his last name?
“Complainant: It’s Davis.
“911 Operator: Davis? Okay, what’s his first name?
“Complainant: Adran
“911 Operator: What is it?
“Complainant: Adrian.
“911 Operator: Adrian?
“Complainant: Yeah.
“911 Operator: Okay. What’s his middle initial?
“Complainant: Mar tell. He’s runnin’ now.” App. in No. 05-5224, pp. 8-9.
As the conversation continued, the operator learned that Davis had “just r[un] out the door” after hitting McCottry, and that he was leaving in a car with someone else. Id., at 9-10. McCottry started talking, but the operator cut her off, saying, “Stop talking and answer my questions.” Id., at 10. She then gathered more information about Davis (including his birthday), and learned that Davis had told McCottry that his purpose in coming to the house was “to get his stuff,” since McCottry was moving. Id., at 11-12. McCottry described the context of the assault, id., at 12, after which the operator told her that the police were on their way. “They’re gonna check the area for him first,” the operator said, “and then they’re gonna come talk to you.” Id., at 12-13.
The police arrived within four minutes of the 911 call and observed McCottry’s shaken state, the “fresh injuries on her forearm and her face,” and her “frantic efforts to gather her belongings and her children so that they could leave the residence.” 154 Wash. 2d 291, 296, 111 P. 3d 844, 847 (2005) (en banc).
The State charged Davis with felony violation of a domestic no-contact order. “The State’s only witnesses were the two police officers who responded to the 911 call. Both officers testified that McCottry exhibited injuries that appeared *819 to be recent, but neither officer could testify as to the cause of the injuries.” Ibid. McCottry presumably could have testified as to whether Davis was her assailant, but she did not appear. Over Davis’s objection, based on the Confrontation Clause of the Sixth Amendment, the trial court admitted the recording of her exchange with the 911 operator, and the jury convicted him. The Washington Court of Appeals affirmed, 116 Wash. App. 81, 64 P. 3d 661 (2003). The Supreme Court of Washington, with one dissenting justice, also affirmed, concluding that the portion of the 911 conversation in which McCottry identified Davis was not testimonial, and that if other portions of the conversation were testimonial, admitting them was harmless beyond a reasonable doubt. 154 Wash. 2d, at 305, 111 P. 3d, at 851. We granted certiorari. 546 U. S. 975 (2005).
B
In Hammon v. Indiana, No. 05-5705, police responded late on the night of February 26, 2003, to a “reported domestic disturbance” at the home of Hershel and Amy Hammon. 829 N. E. 2d 444, 446 (Ind. 2005). They found Amy alone on the front porch, appearing “ ‘somewhat frightened,’ ” but she told them that “ ‘nothing was the matter,’ ” id., at 446, 447. She gave them permission to enter the house, where an officer saw “a gas heating unit in the corner of the living room” that had “flames coming out of the . . . partial glass front. There were pieces of glass on the ground in front of it and there was flame emitting from the front of the heating unit.” App. in No. 05-5705, p. 16.
Hershel, meanwhile, was in the kitchen. He told the police “that he and his wife had ‘been in an argument’ but ‘everything was fine now’ and the argument ‘never became physical.’” 829 N. E. 2d, at 447. By this point Amy had come back inside. One of the officers remained with Hershel; the other went to the living room to talk with Amy, and “again asked [her] what had occurred.” Ibid.; App. in No. 05-5705, at 17, 32. Hershel made several attempts to *820 participate in Amy’s conversation with the police, see id., at 32, but was rebuffed. The officer later testified that Hershel “became angry when I insisted that [he] stay separated from Mrs. Hammon so that we can investigate what had happened.” Id., at 34. After hearing Amy’s account, the officer “had her fill out and sign a battery affidavit.” Id., at 18. Amy handwrote the following: “Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn’t leave the house. Attacked my daughter.” Id., at 2.
The State charged Hershel with domestic battery and with violating his probation. Amy was subpoenaed, but she did not appear at his subsequent bench trial. The State called the officer who had questioned Amy, and asked him to recount what Amy told him and to authenticate the affidavit. Hershel’s counsel repeatedly objected to the admission of this evidence. See id., at 11, 12, 13, 17, 19, 20, 21. At one point, after hearing the prosecutor defend the affidavit because it was made “under oath,” defense counsel said, “That doesn’t give us the opportunity to cross examine [the] person who allegedly drafted it. Makes me mad.” Id., at 19. Nonetheless, the trial court admitted the affidavit as a “present sense impression,” id., at 20, and Amy’s statements as “excited utterances” that “are expressly permitted in these kinds of cases even if the declarant is not available to testify,” id., at 40. The officer thus testified that Amy
“informed me that she and Hershel had been in an argument. That he became irrate [sic] over the fact of their daughter going to a boyfriend’s house. The argument became ... physical after being verbal and she informed me that Mr. Hammon, during the verbal part of the argument was breaking things in the living room and I believe she stated he broke the phone, broke the lamp, broke the front of the heater. When it became physical he threw her down into the glass of the heater.
*821 “She informed me Mr. Hammon had pushed her onto the ground, had shoved her head into the broken glass of the heater and that he had punched her in the chest twice I believe.” Id., at 17-18.
The trial judge found Hershel guilty on both charges, id., at 40, and the Indiana Court of Appeals affirmed in relevant part, 809 N. E. 2d 945 (2004). The Indiana Supreme Court also affirmed, concluding that Amy’s statement was admissible for state-law purposes as an excited utterance, 829 N. E. 2d, at 449; that “a ‘testimonial’ statement is one given or taken in significant part for purposes of preserving it for potential future use in legal proceedings,” where “the motivations of the questioner and declarant are the central concerns,” id., at 456, 457; and that Amy’s oral statement was not “testimonial” under these standards, id., at 458. It also concluded that, although the affidavit was testimonial and thus wrongly admitted, it was harmless beyond a reasonable doubt, largely because the trial was to the bench. Id., at 458-459. We granted certiorari. 546 U. S. 975 (2005).
II
The Confrontation Clause of the Sixth Amendment provides: “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” In Crawford v. Washington, 541 U. S. 36, 53-54 (2004), we held that this provision bars “admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.” A critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase “testimonial statements.” Only statements of this sort cause the declarant to be a “witness” within the meaning of the Confrontation Clause. See id., at 51. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.
*822 Our opinion in Crawford set forth “[v]arious formulations” of the core class of ‘“testimoniar” statements, ibid., but found it unnecessary to endorse any of them, because “some statements qualify under any definition,” id., at 52. Among those, we said, were “[statements taken by police officers in the course of interrogations,” ibid.; see also id., at 53. The questioning that generated the deponent’s statement in Crawford — which was made and recorded while she was in police custody, after having been given Miranda warnings as a possible suspect herself — “qualifies under any conceivable definition” of an “ ‘interrogation,’ ” 541 U. S., at 53, n. 4. We therefore did not define that term, except to say that “[w]e use [it] ... in its colloquial, rather than any technical legal, sense,” and that “one can imagine various definitions . . . , and we need not select among them in this case.” Ibid. The character of the statements in the present cases is not as clear, and these eases require us to determine more precisely which police interrogations produce testimony.
Without attempting to produce an exhaustive classification of all conceivable statements — or even all conceivable statements in response to police interrogation — as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[1]
*823 III
A
In Crawford, it sufficed for resolution of the case before us to determine that “even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.” Id., at 53. Moreover, as we have just described, the facts of that case spared us the need to define what we meant by “interrogations.” The Davis ease today does not permit us this luxury of indecision. The inquiries of a police operator in the course of a 911 call[2] are an interrogation in one sense, but not in a sense that “qualifies under any conceivable definition.” We must decide, therefore, whether the Confrontation Clause applies only to testimonial hearsay; and, if so, whether the recording of a 911 call qualifies.
The answer to the first question was suggested in Crawford, even if not explicitly held:
“The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to ‘witnesses’ against the accused — in other words, those who ‘bear testimony.’ 1 N. Webster, An American Dictionary of *824 the English Language (1828). ‘Testimony,’ in turn, is typically ‘a solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ Ibid. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.” 541 U. S., at 51.
A limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its “core,” but its perimeter.
We are not aware of any early American case invoking the Confrontation Clause or the common-law right to confrontation that did not clearly involve testimony as thus defined.[3] Well into the 20th century, our own Confrontation Clause jurisprudence was carefully applied only in the testimonial context. See, e. g., Reynolds v. United States, 98 U. S. 145, *825 158 (1879) (testimony at prior trial was subject to the Confrontation Clause, but petitioner had forfeited that right by procuring witness’s absence); Mattox v. United States, 156 U. S. 237, 240-244 (1895) (prior trial testimony of deceased witnesses admitted because subject to cross-examination); Kirby v. United States, 174 U. S. 47, 55-56 (1899) (guilty pleas and jury conviction of others could not be admitted to show that property defendant received from them was stolen); Motes v. United States, 178 U. S. 458, 467, 470-471 (1900) (written deposition subject to cross-examination was not admissible because witness was available); Dowdell v. United States, 221 U. S. 325, 330-331 (1911) (facts regarding conduct of prior trial certified to by the judge, the clerk of court, and the official reporter did not relate to defendants’ guilt or innocence and hence were not statements of “witnesses” under the Confrontation Clause).
Even our later cases, conforming to the reasoning of Ohio v. Roberts, 448 U. S. 56 (1980),[4] never in practice dispensed with the Confrontation Clause requirements of unavailability and prior cross-examination in cases that involved testimonial hearsay, see Crawford, 541 U. S., at 57-59 (citing cases), with one arguable exception, see id., at 58, n. 8 (discussing White v. Illinois, 502 U. S. 346 (1992)). Where our cases did dispense with those requirements — even under the Roberts approach — the statements at issue were clearly nontestimonial. See, e. g., Bourjaily v. United States, 483 U. S. 171, 181-184 (1987) (statements made unwittingly to a Government informant); Dutton v. Evans, 400 U. S. 74, 87-89 (1970) (plurality opinion) (statements from one prisoner to another).
Most of the American cases applying the Confrontation Clause or its state constitutional or common-law counter *826 parts involved testimonial statements of the most formal sort — sworn testimony in prior judicial proceedings or formal depositions under oath — which invites the argument that the scope of the Clause is limited to that very formal category. But the English cases that were the progenitors of the Confrontation Clause did not limit the exclusionary rule to prior court testimony and formal depositions, see Crawford, supra, at 52, and n. 3. In any event, we do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman recite the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition. Indeed, if there is one point for which no case — English or early American, state or federal — can be cited, that is it.
The question before us in Davis, then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements. When we said in Crawford, supra, at 53, that “interrogations by law enforcement officers fall squarely within [the] class” of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial. It is, in the terms of the 1828 American dictionary quoted in Crawford, “‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’” 541 U. S., at 51. (The solemnity of even an oral declaration of relevant past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood. See, e. g., United States v. Stewart, 433 F. 3d 273, 288 (CA2 2006) (false statements made to federal investigators violate 18 U. S. C. § 1001); State v. Reed, 2005 WI 53, *827 ¶ 30, 280 Wis. 2d 68, 85, 695 N. W. 2d 315, 323 (state criminal offense to “knowingly giv[e] false information to [an] officer with [the] intent to mislead the officer in the performance of his or her duty”).) A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to “establis[h] or prov[e]” some past fact, but to describe current circumstances requiring police assistance.
The difference between the interrogation in Davis and the one in Crawford, is apparent on the face of things. In Davis, McCottry was speaking about events as they were actually happening, rather than “describing] past events,” Lilly v. Virginia, 527 U. S. 116, 137 (1999) (plurality opinion). Sylvia Crawford’s interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that Mc-Cottry (unlike Sylvia Crawford) was facing an ongoing emergency. Although one might call 911 to provide a narrative report of a crime absent any imminent danger, McCottry’s call was plainly a call for help against a bona fide physical threat. Third, the nature of what was asked and answered in Davis, again viewed objectively^ was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past. That is true even of the operator’s effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. See, e. g., Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty., 542 U. S. 177, 186 (2004). And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry’s frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.
*828 We conclude from all this that the circumstances of McCottry’s interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a witness; she was not testifying. What she said was not “a weaker substitute for live testimony” at trial, United States v. Inadi, 475 U. S. 387, 394 (1986), like Lord Cobham’s statements in Raleigh’s Case, 2 How. St. Tr. 1 (1603), or Jane Dingier’s ex parte statements against her husband in King v. Dingler, 2 Leach 561, 168 Eng. Rep. 383 (1791), or Sylvia Crawford’s statement in Crawford. In each of those cases, the ex parte actors and the evidentiary products of the ex parte communication aligned perfectly with their courtroom analogues. McCottry’s emergency statement does not. No “witness” goes into court to proclaim an emergency and seek help.
Davis seeks to cast McCottry in the unlikely role of a witness by pointing to English cases. None of them involves statements made during an ongoing emergency. In King v. Brasier, 1 Leach 199, 168 Eng. Rep. 202 (1779), for example, a young rape victim, “immediately on her coming home, told all the circumstances of the injury” to her mother. Id., at 200, 168 Eng. Rep., at 202. The case would be helpful to Davis if the relevant statement had been the girl’s screams for aid as she was being chased by her assailant. But by the time the victim got home, her story was an account of past events.
This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it, “evolve into testimonial statements,” 829 N. E. 2d, at 457, once that purpose has been achieved. In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, *829 from that point on, McCottry’s statements were testimonial, not unlike the “structured police questioning” that occurred in Crawford, 541 U. S., at 53, n. 4. This presents no great problem. Just as, for Fifth Amendment purposes, “police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect,” New York v. Quarles, 467 U. S. 649, 658-659 (1984), trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through in limine procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence. Davis’s jury did not hear the complete 911 call, although it may well have heard some testimonial portions. We were asked to classify only McCottry’s early statements identifying Davis as her assailant, and we agree with the Washington Supreme Court that they were not testimonial. That court also concluded that, even if later parts of the call were testimonial, their admission was harmless beyond a reasonable doubt. Davis does not challenge that holding, and we therefore assume it to be correct.
B
Determining the testimonial or nontestimonial character of the statements that were the product of the interrogation in Hammon is a much easier task, since they were not much different from the statements we found to be testimonial in Crawford. It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct — as, indeed, the testifying officer expressly acknowledged, App. in No. 05-5705, at 25, 32, 34. There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything, id., at 25. When the *830 officers first arrived, Amy told them that things were fine, id., at 14, and there was no immediate threat to her person. When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine (as in Davis) “what is happening,” but rather “what happened.” Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime — which is, of course, precisely what the officer should have done.
It is true that the Crawford interrogation was more formal. It followed a Miranda warning, was tape-recorded, and took place at the station house, see 541 U. S., at 53, n. 4. While these features certainly strengthened the statements’ testimonial aspect — made it more objectively apparent, that is, that the purpose of the exercise was to nail down the truth about past criminal events — none was essential to the point. It was formal enough that Amy’s interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his “investigation].” App. in No. 05-5705, at 34. What we called the “striking resemblance” of the Crawford statement to civil-law ex parte examinations, 541 U. S., at 52, is shared by Amy’s statement here. Both declarants were actively separated from the defendant — officers forcibly prevented Hershel from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial.[5]
*831 Both Indiana and the United States as amicus curiae argue that this case should be resolved much like Davis. For the reasons we find the comparison to Crawford compelling, we find the comparison to Davis unpersuasive. The statements in Davis were taken when McCottry was alone, not only unprotected by police (as Amy Hammon was protected), but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. McCottry’s present-tense statements showed immediacy; *832 Amy’s narrative of past events was delivered at some remove in time from the danger she described. And after Amy answered the officer’s questions, he had her execute an affidavit, in order, he testified, “[t]o establish events that have occurred previously.” App. in No. 05-5705, at 18.
Although we necessarily reject the Indiana Supreme Court’s implication that virtually any “initial inquiries” at the crime scene will not be testimonial, see 829 N. E. 2d, at 453, 457, we do not hold the opposite — that no questions at the scene will yield nontestimonial answers. We have already observed of domestic disputes that “[ojfficers called to investigate .. . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.” Hiibel, 542 U. S., at 186. Such exigencies may often mean that “initial inquiries” produce nontestimonial statements. But in cases like this one, where Amy’s statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were “initial inquiries” is immaterial. Cf. Crawford, supra, at 52, n. 3.[6]
IV
Respondents in both cases, joined by a number of their amici, contend that the nature of the offenses charged in these two cases — domestic violence — requires greater flexibility in the use of testimonial evidence. This particular *833 type of crime is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial. When this occurs, the Confrontation Clause gives the criminal a windfall. We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free. Cf. Kyllo v. United States, 533 U. S. 27 (2001) (suppressing evidence from an illegal search). But when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in Crawford: that “the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds.” 541 U. S., at 62 (citing Reynolds, 98 U. S., at 158-159). That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.
We take no position on the standards necessary to demonstrate such forfeiture, but federal courts using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard, see, e.g., United States v. Scott, 284 F. 3d 758, 762 (CA7 2002). State courts tend to follow the same practice, see, e. g., Commonwealth v. Edwards, 444 Mass. 526, 542, 830 N. E. 2d 158, 172 (2005). Moreover, if a hearing on forfeiture is required, Edwards, for instance, observed that “hearsay evidence, including the unavailable witness’s out-of-court statements, may be considered.” Id., at 545, 830 N. E. 2d, at 174. The Roberts approach to the Confrontation Clause undoubtedly made recourse to this doctrine less necessary, because prosecutors could show the “reliability” of ex parte statements more easily than they could show the defendant’s procurement of the witness’s absence. *834 Crawford, in overruling Roberts, did not destroy the ability of courts to protect the integrity of their proceedings.
We have determined that, absent a finding of forfeiture by wrongdoing, the Sixth Amendment operates to exclude Amy Hammon’s affidavit. The Indiana courts may (if they are asked) determine on remand whether such a claim of forfeiture is properly raised and, if so, whether it is meritorious.
* * *
We affirm the judgment of the Supreme Court of Washington in No. 05-5224. We reverse the judgment of the Supreme Court of Indiana in No. 05-5705, and remand the case to that court for proceedings not inconsistent with this opinion.

It is so ordered.

 Our holding refers to interrogations because, as explained below, the statements in the cases presently before us are the products of interrogations — which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers *823 were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation. (Part of the evidence against Sir Walter Raleigh was a letter from Lord Cobham that was plainly not the result of sustained questioning. Raleigh’s Case, 2 How. St. Tr. 1, 27 (1603).) And of course even when interrogation exists, it is in the final analysis the declarant’s statements, not the interrogator’s questions, that the Confrontation Clause requires us to evaluate.

 If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police. As in Crawford v. Washington, 541 U. S. 36 (2004), therefore, our holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are “testimonial.”

 See, e. g., State v. Webb, 2 N. C. 103, 103-104 (Super. L. & Eq. 1794) (per curiam) (excluding deposition taken in absence of the accused); State v. Atkins, 1 Tenn. 229 (Super. L. & Eq. 1807) (per curiam) (excluding prior testimony of deceased witness); Johnston v. State, 10 Tenn. 58, 59 (Err. & App. 1821) (admitting written deposition of deceased deponent, because defendant had the opportunity to cross-examine); Finn v. Commonwealth, 26 Va. 701, 707-708 (1827) (excluding prior testimony of a witness still alive, though outside the jurisdiction); State v. Hill, 20 S. C. L. 607 (App. 1835) (excluding deposition of deceased victim taken in absence of the accused); Commonwealth v. Richards, 35 Mass. 434, 436-439 (1837) (excluding preliminary examination testimony of deceased witness because the witness’s precise words were not available); Bostick v. State, 22 Tenn. 344 (1842) (admitting deposition of deceased where defendant declined opportunity to cross-examine); People v. Newman, 5 Hill 295 (N. Y. Sup. Ct. 1843) (per curiam) (excluding prior trial testimony of witness who was still alive); State v. Campbell, 30 S. C. L. 124, 125 (App. L. 1844) (excluding deposition taken in absence of the accused); State v. Valentine, 29 N. C. 225 (1847) (per curiam) (admitting preliminary examination testimony of decedent where defendant had opportunity to cross-examine); Kendrick v. State, 29 Tenn. 479, 491 (1850) (admitting testimony of deceased witness at defendant’s prior trial); State v. Houser, 26 Mo. 431, 439-441 (1858) (excluding deposition of deponent who was still alive).

 “Roberts conditioned] the admissibility of all hearsay evidence on whether it falls under a ‘firmly rooted hearsay exception’ or bears ‘particularized guarantees of trustworthiness.’ ” Crawford, 541 U. S., at 60 (quoting Roberts, 448 U. S., at 66). We overruled Roberts in Crawford by restoring the unavailability and cross-examination requirements.

 The dissent criticizes our test for being “neither workable nor a targeted attempt to reach the abuses forbidden by the [Confrontation] Clause,” post, at 842 (Thomas, J., concurring in judgment in part and dissenting in part). As to the former: We have acknowledged that our hold *831 ing is not an “exhaustive classification of all conceivable statements — or even all conceivable statements in response to police interrogation,” supra, at 822, but rather a resolution of the cases before us and those like them. For those eases, the test is objective and quite “workable.” The dissent, in attempting to formulate an exhaustive classification of its own, has not provided anything that deserves the description “workable” — unless one thinks that the distinction between “formal” and “informal” statements, see post, at 836-838, qualifies. And the dissent even qualifies that vague distinction by acknowledging that the Confrontation Clause “also reaches the use of technically informal statements when used to evade the formalized process,” post, at 838, and cautioning that the Clause would stop the State from “us[ing] out-of-court statements as a means of circumventing the literal right of confrontation,” ibid. It is hard to see this as much more “predictable,” ibid., than the rule we adopt for the narrow situations we address. (Indeed, under the dissent’s approach it is eminently arguable that the dissent should agree, rather than disagree, with our disposition in Hammon v. Indiana, No. 05-5705.)
As for the charge that our holding is not a “targeted attempt to reach the abuses forbidden by the [Confrontation] Clause,” post, at 842, which the dissent describes as the depositions taken by Marian magistrates, characterized by a high degree of formality, see post, at 835-836: We do not dispute that formality is indeed essential to testimonial utterance. But we no longer have examining Marian magistrates; and we do have, as our 18th-century forebears did not, examining police officers, see L. Friedman, Crime and Punishment in American History 67-68 (1993) — who perform investigative and testimonial functions once performed by examining Marian magistrates, see J. Langbein, The Origins of Adversary Criminal Trial 41 (2003). It imports sufficient formality, in our view, that lies to such officers are criminal offenses. Restricting the Confrontation Clause to the precise forms against which it was originally directed is a recipe for its extinction. Cf. Kyllo v. United States, 533 U. S. 27 (2001).

 Police investigations themselves are, of course, in no way impugned by our characterization of their fruits as testimonial. Investigations of past crimes prevent future harms and lead to necessary arrests. While prosecutors may hope that inculpatory “nontestimonial” evidence is gathered, this is essentially beyond police control. Their saying that an emergency exists cannot make it be so. The Confrontation Clause in no way governs police conduct, because it is the trial use of, not the investigatory collection of, ex parte testimonial statements which offends that provision. But neither can police conduct govern the Confrontation Clause; testimonial statements are what they are.