RUCKER, J.,
dissenting in part.
I respectfully dissent from that portion of the majority opinion declaring as non-testimonial the statements J.M. made to the Forensic Nürse identifying Ward as her attacker. It is certainly true there are circumstances under which the identity of an alleged abuser is necessary to enable medical personnel to provide appropriate diagnosis and treatment. ■ But here the' majority goes a step further and essentially takes the position that in all cases involving a medical care provider — no matter the facts — the identity of the alleged abuser is necessaiy, non-testimonial, and admissible in the face of a Sixth Amendment Confrontation Clause challenge. I cannot agree because this sets a dangerous precedent for future cases.
First, it is apparent that here the Forensic Nurse was serving in a dual capacity: obtaining information necessary for appropriate medical diagnosis and treatment as well as gathering evidence for use in a criminal prosecution. On this latter point, the record shows that upon referral to the Forensic Nurse, J.M. was presented with a “General Information” sheet. Page one contained the following “patient consent” section:
I hereby consent to a physical examination by a specially trained Forensic Nurse Examiner to discover and preserve evidence of the assault.
I understand that the report of the examination and any evidence or specimens collected will be released to law enforcement authorities, I also understand that I may withdraw my consent at any time for any portion of the examination.
I understand that collection of evidence may include photographing and sketching of injuries. Knowing this, I consent to having photographs taken for use as *765 evidence. I do consent to the use of these photographs for educational purposes.
State’s Ex. 14, Ex. Confidential Vol. at 96 (emphasis added). J.M. affixed her initials next to each paragraph and then signed the form. Also included on the first page were the Forensic Nurse’s signature and a social worker’s name. The page also included a space for information from “Law Enforcement” including spaces for the responding officer’s name, detective’s mame, agency, case number, and phone number. Id. The case number was filled in, with a note that reads “police report made at [patient’s] mother’s home.” Id. Page two included blanks for the Forensic Nurse to fill in, describing “[l]ocation and physical surroundings of assault” and the alleged assailant(s) name(s), age, gender, ethnicity, and relationship to the patient. Id. at 97. Pages three and four included body maps, with the Forensic Nurse’s notes to indicate what type of injury was present, how the injuries were inflicted, and the identity of the assailant. Id. at 98-99.
With respect to the Forensic Nurse’s capacity as a medical caregiver the following exchange occurred:
Q. [Deputy. Prosecutor:] Now what do you tell a patient about the purpose of your examination of them, when you’re doing this examination?
A. [Forensic Nurse:] Uh, I would introduce myself, tell them my role, tell them that I work in conjunction with their physician as a specially trained nurse to help evaluate any type of injuries that they might have based on the mechanism. And, again, working in conjunction with a physician, looking for injuries, first and foremost. At that point in time, after all the diagnostics are done, if they want lab tests, x-rays, then they are given the opportunity, if they so desire, to have forensic documentation done of their injuries as well. That is secondary though. ■
Q. [Deputy Prosecutor:] Now can you explain the basis [sic] steps in your examination?
A. [Forensic Nurse:] No matter what type of patient it is, any type of an assault patient or victim of violence we always do the same thing so I don’t miss anything. After getting their medical history, medications, speaking with them, asking where their discomfort is, how it happened, I would go from head to toe, and then from outer extremities then into the core of their body. But, again, it would only be done after we know their vital signs are okay, their respiration are [sic] okay, and whatnot. * * *
Q. [Deputy Prosecutor:] And is it important to determine who caused the injury for you[r] assessment?
A. [Forensic Nurse:] Yes.
Q. [Deputy Prosecutor:] And why is that?
A. [Forensic Nurse:] Especially, again, victims of any type of violence, it would be really important to know if they knew who the perpetrator was. Because a large part of the forensic nurse[’]s job is to collaborate with social work and the patient in order to ensure safety flan for that person if they are well enough to be discharged. * * *
Q. [Deputy Prosecutor:] And what difference does it make in knowing the identity of the person who caused the injuries?
A. [Forensic Nurse:] Your resources and safety flan would be a lot different, for instance, if you are attacked by a stranger, an unknown person in a *766 parking garage, let’s say, downtown, versus somebody who might be a family member or someone you are living with. If there is a common child, if you share a child, because there might be visitation, custody issues. So it’s critically important that you know if you can find out who that person is.
Q. [Deputy Prosecutor:] And you consider that part of your role, not just the social workers?
A. [Forensic Nurse:] Uh, safety plans for a patient of violence are a critical part of my role. Again, it’s first a medical'evaluation to make sure the patient is stabilized, to make sure no injuries are missed. And then safety plan resources discharge where they’re going to go, do they have a safe place. Those are all critically important also for the forensic nurse.
Tr. at 232-33, 234-35 (emphasis added).
Concerning the safety plan the following exchange occurred:
Q. [Deputy Prosecutor:] And what discharge plan was developed for [J.M.]?
A. [Forensic Nurse:] Mainly we just ... We needed to make sure that she had a safe place to go. And I don’t know how much I’m able to talk about this based upon ...
Q. [Deputy Prosecutor:] Well, did you .,. So that was a concern to you?
A. [Forensic Nurse:] Oh, yeah.
Q. [Deputy Prosecutor:] Okay. And did you develop a discharge plan that attempted to ensure safety?
A. [Forensic Nurse:] Yes.
Q. [Deputy Prosecutor:] Aso when she was in the hospital was she put on a certain, a specific status, based upon the history you’d been given?
A. [Forensic Nurse:] Yes. For ...
Q. [Deputy Prosecutor:] What was that?
A. [Forensic Nurse:] ... patients in her situation. And we also obtain permission from the patient before this is done. But patients like [J.M.] are made a no information patient in case someone who might have been the person who injured my patient would call the hospital looking for them, then we would have permission to say they were not there.
Q. [Deputy Prosecutor:] Okay. So she was put on that status of a no ...
A. [Forensic Nurse:] No information patient.
Tr. at 290-91 (ellipses in original).
As the foregoing colloquy makes clear the Forensic Nurse was unequivocal in her contention that she needed to know the identity of J.M.’s abuser in order to develop a plan to protect J.M.’s safety. In essence the Forensic Nurse declared that she needed the information to provide J.M. appropriate treatment. The problem however is that other than placing J.M. on a “no information” status for the few hours she remained at the hospital that evening, nothing in the record of the trial of this cause establishes that the Forensic Nurse actually developed a so-called “safety plan.”[1] Instead, upon release J.M. was instructed: “Take medications as prescribed,” “Return for worsening symptoms,” and “Follow up with primary care physician.” State’s Ex. 14, Ex. Confidential Vol. at 150. Indeed the “Depart Sum *767 mary” reflects that J.M. was prescribed pain medication and experienced a “Routine Discharge” to “[h]ome.” Id. at 171.
The question is whether objectively considered, the interrogation that took place in the course of the Forensic Nurse’s interview with J.M. produced testimonial statements. Absent any evidence in the trial record that the abuser’s identity was necessary to diagnose or treat J.M.’s injuries — either physical, emotional, or psychological — one is compelled to conclude that the primary purpose of the Forensic Nurse’s interview with J.M. concerning the identity of her abuser was to “establish or prove past events potentially relevant to later criminal prosecution.” Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Essentially, if the State insists on introducing “identity of the abuser” testimony through a medical care provider then it is absolutely imperative that the State produce evidence at trial explaining how and why such testimony is relevant to medical treatment. That simply did not happen here.
In sum J.M.’s statements to the Forensic Nurse were testimonial and thus inadmissible in the face of a Sixth Amendment Confrontation Clause challenge. In the paraphrased words of the Davis Court, I “do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking [Forensic Nurse] recite the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition.” Davis, 547 U.S. at 826, 126 S.Ct. 2266. I therefore respectfully dissent from the majority’s contrary position on this point. Otherwise I concur.
DICKSON, J., concurs.