J-S19017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICKELL BYNUM, | |
| Appellant | No. 949 MDA 2016 |

Appeal from the Judgment of Sentence Entered May 11, 2016
In the Court of Common Pleas of Lancaster County
Civil Division at No(s): CI-14-10545 (PFA) 16-0057 (ICC)

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MAY 16, 2017**

Appellant, Mickell Bynum, appeals from the judgment of sentence of three months' imprisonment, followed by three months' probation, imposed after a non-jury trial at which he was found guilty of one count of indirect criminal contempt (ICC) for violating a protection from abuse (PFA) order. Appellant challenges the court's admission of certain evidence, as well as the sufficiency of the evidence to sustain his conviction.  After careful review, we affirm.

The facts of this case were summarized by the trial court as follows:

> On February 2, 2015[,] this court issued a [PFA] [o]rder against [Appellant] protecting Michelle Melendez ("Ms. Melendez").  On April 19, 2016, Lancaster County-wide Emergency Communications Center received a phone call from a

---

[*] Former Justice specially assigned to the Superior Court.

woman, identifying herself as Michelle Melendez, requesting police assistance at the corner of Orange Street and Franklin Street in Lancaster City. Ms. Melendez's ex-boyfriend, [Appellant], had entered the barbershop where she was, pulled her in front of a group of people, and taken her shoes. During the 9-1-1 call, Ms. Melendez can be heard yelling at Mr. Bynum as she answers the operator's questions. The call lasted a duration of 1 minute 42 seconds before Ms. Melendez was cut off.

The police responded to the scene, but by the time they arrived Mr. Bynum had left the area. [Lancaster City Police] Officer [Juanita] Martinez-Bender, who was employed with the Lancaster City Police at the time of the incident, testified at the ICC hearing that on the day of the incident she responded to a call from Lancaster County Communications that a PFA violation was in progress and that the subject in violation had been identified as [Appellant].

At the hearing, Officer Martinez-Bender testified that when she arrived at the scene, her supervisor directed her to speak with Ms. Melendez because [Appellant] had already left the scene. Officer Martinez-Bender described Ms. Melendez as visibly upset, shaking, and talking nervously and loudly. The Officer testified that after speaking with Ms. Melendez she confirmed that there was a valid PFA against [Appellant] prohibiting contact between [Appellant] and Ms. Melendez. Officer Martinez-Bender further testified that after an initial foot chase, two other officers were able to make contact with [Appellant] and bring him into the police station.

Ms. Melendez did not attend the ICC hearing, nor did she offer any testimony or evidence. Allegedly, she was unable to attend any of the scheduled hearings because she regularly took her special needs child to Hershey Medical Center for appointments. No documentation of these appointments was submitted to the court.

Trial Court Opinion (TCO), 8/17/16, at 2-3.

Based on this evidence, the court convicted Appellant of one count of

ICC. That same day (May 11, 2016), the court sentenced him to three

months' incarceration, followed by three months' probation. Appellant filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement. The court issued a Rule 1925(a) opinion on August 17, 2016.

Herein, Appellant presents two issues for our review:

I. Did the court err in admitting the 9-1-1 call purportedly made by Michelle Melendez, where the primary purpose of the call was testimonial?

II. Was the evidence presented by the Commonwealth insufficient to sustain [Appellant's] conviction for [ICC], where the sole evidence that [Appellant] had contact with [Ms. Melendez] in [violation of] a protective order against him was a 9-1-1 call from a woman whose voice was not identified by any witness or through circumstantial evidence?

Appellant's Brief at 5.

Appellant first challenges the trial court's admission of a recording of Michelle Melendez's 911 call.[1] To begin,

[t]he standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit

_____

[1] Curiously, Appellant asserts that he waived this claim for our review by not raising it in his Rule 1925(b) statement. We disagree. In that statement, Appellant declared: "Admission of this 9-1-1 call under the instant circumstances was a violation of [Appellant's] due process rights pursuant to Article I, Section One of the Constitution of the Commonwealth of Pennsylvania, and the Fifth and Fourteenth Amendments to the United States Constitution." Rule 1925(b) Statement, 7/11/16, at 2 (unnumbered). While we recognize that Appellant stated this claim within an issue challenging the sufficiency of the evidence, the trial court understood that he was contesting the admission of the 911 recording, and it addressed that claim in its opinion. *See* TCO at 4-5. Accordingly, we consider Appellant's first issue adequately preserved for our review.

> evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. ***Commonwealth v. Hunzer***, 868 A.2d 498 (Pa. Super. 2005). Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. ***Id.***

***Commonwealth v. Young***, 989 A.2d 920, 924 (Pa. Super. 2010) (citation omitted).

In this case, Appellant argues that the court's admission of Melendez's recorded 911 call was an abuse of discretion because Melendez's statements during that call were testimonial, and Appellant was not afforded his Confrontation Clause right of cross-examining her. The trial court ruled that Melendez's statements were nontestimonial and, therefore, they were not subject to the Confrontation Clause. After careful review, we agree with the trial court.

"The Confrontation Clause of the Sixth Amendment provides: In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." ***Davis v. Washington***, 547 U.S. 813, 821 (2006) (internal quotation marks omitted). In ***Crawford v. Washington***, 541 U.S. 36 (2004), the United States Supreme Court "held that this provision bars 'admission of ***testimonial*** statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" ***Davis***, 547 U.S. at 821 (quoting ***Crawford***, 541 U.S. at 53-54) (emphasis added). Later, the ***Davis***

Court more specifically defined what types of statements are testimonial, versus nontestimonial:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

**Davis**, 547 U.S. at 821 (footnote omitted).

The **Davis** Court then went on to examine whether statements made by Michelle McCottry during a call to a 911 emergency operator were testimonial. The Court described McCottry's statements during that call, and what police observed when they arrived at her location, as follows:

> "911 Operator: Hello.
>
> "Complainant: Hello.
>
> "911 Operator: What's going on?
>
> "Complainant: He's here jumpin' on me again.
>
> "911 Operator: Okay. Listen to me carefully. Are you in a house or an apartment?
>
> "Complainant: I'm in a house.
>
> "911 Operator: Are there any weapons?
>
> "Complainant: No. He's usin' his fists.
>
> "911 Operator: Okay. Has he been drinking?
>
> "Complainant: No.
>
> "911 Operator: Okay, sweetie. I've got help started. Stay on the line with me, okay?

"Complainant: I'm on the line.

"911 Operator: Listen to me carefully. Do you know his last name?

"Complainant: It's Davis.

"911 Operator: Davis? Okay, what's his first name?

"Complainant: Adrian[.]

"911 Operator: What is it?

"Complainant: Adrian.

"911 Operator: Adrian?

"Complainant: Yeah.

"911 Operator: Okay. What's his middle initial?

"Complainant: Martell. He's runnin' now."

As the conversation continued, the operator learned that Davis had "just r[un] out the door" after hitting McCottry, and that he was leaving in a car with someone else. McCottry started talking, but the operator cut her off, saying, "Stop talking and answer my questions." She then gathered more information about Davis (including his birthday), and learned that Davis had told McCottry that his purpose in coming to the house was "to get his stuff," since McCottry was moving. McCottry described the context of the assault, after which the operator told her that the police were on their way. "They're gonna check the area for him first," the operator said, "and then they're gonna come talk to you."

The police arrived within four minutes of the 911 call and observed McCottry's shaken state, the "fresh injuries on her forearm and her face," and her "frantic efforts to gather her belongings and her children so that they could leave the residence."

*Davis*, 547 U.S. at 817–18 (citations to the record omitted).

In objectively considering whether McCottry's statements were testimonial, the *Davis* Court initially noted that "at least the initial

interrogation conducted in connection with a 911 call[] is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827. The Court then held that McCottry's statements in the 911 call were nontestimonial, offering three reasons for that conclusion. First, the Court stressed that McCottry "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events[.]'" *Id.* (citation omitted; emphasis in original). Second, the Court found that "any reasonable listener would recognize that McCottry … was facing an ongoing emergency[,]" and that her "call was plainly a call for help against bona fide physical threat." *Id.* The Court further noted that, unlike calmly answering a series of questions posed by an interrogator, "McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id.* Third, the *Davis* Court declared that,

> the nature of what was asked and answered in *Davis*, again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn … what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon.

*Id.* (emphasis in original). Based on all of these circumstances, the *Davis* Court concluded that the "primary purpose" of McCottry's interrogation "was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness*; she was not *testifying*." *Id.* at 828 (emphasis in

- 7 -

original). Accordingly, McCottry's statements in the 911 call were nontestimonial and not subject to the protections afforded by the Confrontation Clause.

The circumstances of the present case are similar enough to *Davis* to convince us that Melendez's statements during the 911 call were also nontestimonial. The entirety of Melendez's and the operator's statements during the 911 call were as follows:

Operator: Lancaster County 911. Do you need police, fire, [or] ambulance?

Victim: I need police.

Operator: Ok. Where do you need the police?

Victim: I'm right here on Orange and Franklin Streets.

Operator: Orange where?

Victim: And Franklin.

Operator: Okay. And what city, township, or borough are you in?

Victim: Lancaster City.

Operator: Okay. And what's going on there?

Victim: Umm. I have a PFA on my ex-boyfriend and he just took my shoes off.

Operator: Okay, he took your shoes off?

Victim: Yes.

Operator: So he's there with you?

Victim: He … left in his car.

Operator: So what, he come [*sic*] up to you on the street and then what?

Victim: [In] the barbershop. Like I'm in a barbershop [and] he pulled me in front of all these people.

Operator: Okay, so you're in the barbershop there on the corner?

Victim: Yeah, I'm barefoot right now.

Operator: Okay, so you were there and then he came in?

Victim: He's right here again on the … he's right here.

Operator: Okay.  Alright, what's his name?

[pause]

Operator: What's his name?

Victim: Mikell Bynum.

Operator: Mikell?

Victim: Yes. [shouting to Appellant] I did it already! You're not gonna [inaudible] keep doing this shit to me for eight years, you mother fucker! You're going the fuck to jail.

Operator: Okay, do you know how to spell his last name?

Victim: Bynum.  Bynum.

Operator: Okay.  And what's your name?

Victim: Michelle.

Operator: And what's your last name, Michelle?

Victim: Melendez.

Operator: Okay.  And I have officers being dispatched to you now, okay? What's your cell phone number you're calling from?

Commonwealth's Exhibit 1.  At that point, the call ended without an answer from Melendez.

Based on this recording, we conclude that, as in *Davis*, Melendez called 911 to request police assistance during an ongoing emergency.  We recognize that Melendez stated, at the outset of the call, that Appellant was

no longer at the scene. However, that does not establish, from an objective perspective, that there was no 'ongoing emergency.' Melendez made it clear to the operator that Appellant had 'just' been in contact with her, pulling her from a barbershop, taking her shoes, and leaving her stranded and barefoot on a public street. Moreover, Melendez described to the operator the events as they were occurring, including Appellant's return to the scene.

We also reject Appellant's assertion that Melendez's screaming at him that he was going to jail revealed that her primary purpose in calling 911 was to provide testimonial statements to police. Notably, Melendez spontaneously made that statement to Appellant; it was not a response to any question posed by the 911 operator. Moreover, Melendez's screaming this to Appellant indicates, to any reasonable listener, that she was upset and frantic, and that she was speaking to the operator during the course of an ongoing emergency, which was made more alarming by Appellant's return to the scene. Our conclusion that Melendez's statements were made for the primary purpose of getting help is also supported by the fact that Officer Martinez-Bender testified that when she arrived at the scene, Melendez was "visibly upset" and was "shaking, talking nervously, [and] talking real[ly] loud." N.T. Trial, 5/11/16, at 9.

Furthermore, assessing the questions asked by the operator during the course of Melendez's 911 call makes it apparent that the operator was attempting to resolve the conflict, not simply trying to learn about what had happened. For instance, the operator asked questions to ascertain where

- 10 -

Melendez was located, what sort of danger she was facing, and who was posing that danger to her. In addition, after being told by Melendez that Appellant had returned to the scene, the operator asked for Appellant's first and last name, presumably to ensure that the officers dispatched to the scene "might know whether they would be encountering a violent felon." **Davis**, 547 U.S. at 827 (citations omitted).

For all of these reasons, we conclude that, as in **Davis**, Melendez's statements during the 911 call were made during the course of an ongoing emergency, and for the purpose of obtaining police assistance. Consequently, the trial court did not err in finding that her statements were not subject to the Confrontation Clause.[2]

Next, Appellant challenges the sufficiency of the evidence to sustain his ICC conviction, arguing that the Commonwealth failed to 'authenticate' that the person who made the 911 call was Michelle Melendez and, thus, there was no proof that Appellant "had violated the PFA [o]rder by having contact with [] Melendez." Appellant's Brief at 16-17.[3] Appellant's argument is unconvincing. Preliminarily,

---

[2] We point out that Appellant does not argue that Melendez's statements in the 911 call were inadmissible hearsay. Accordingly, we do not address that issue.

[3] To the extent that Appellant's reference to the 'authentication' of the 911 call suggests he is challenging the admission of that evidence, his argument is waived. Appellant at no point objected to the authenticity of the 911
*(Footnote Continued Next Page)*

[t]he standard we apply in reviewing the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Lambert***, 795 A.2d 1010, 1014 (Pa. Super. 2002) (citations and internal quotation marks omitted).

Here, in the recording of the 911 call, the caller identified herself as Michelle Melendez. She stated that she had a PFA order against her 'ex-boyfriend,' who just pulled her from a barbershop and took her shoes. She gave Appellant's name when the operator asked who did those things to her. Additionally, Officer Martinez-Bender testified that she received the report that "a Michelle Melendez … had called in" to 911. N.T. Trial at 8. The

*(Footnote Continued)* ─────────────────

recording at trial; therefore, he cannot raise that claim for the first time on appeal. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

officer responded to the location provided by the 911 caller and encountered a "visibly upset" woman named Michelle Melendez. *Id.* at 9. Based on the information provided to her by Melendez, Officer Martinez-Bender "checked to see if there was a valid PFA" and confirmed that there was, with the "named parties on that PFA" being "Michelle Melendez and Mikell Bynum." *Id.* at 10. We conclude that this circumstantial evidence was sufficient to prove that the 911 caller was the same Michelle Melendez who had a valid PFA order against Appellant at the time of the call.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/16/2017

- 13 -