[Cite as *State v. Stage*, 2012-Ohio-3300.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | | |

STATE OF OHIO

    Appellee

    v.

SCOTT E. STAGE

    Appellant

C.A. No.      11CA0077-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.      10-CR-0583

DECISION AND JOURNAL ENTRY

Dated: July 23, 2012

DICKINSON, Judge.

INTRODUCTION

{¶1} Steven Keresztesi Jr. went to meet some representatives of the Hells Angels to discuss his motorcycle club's desire to wear its club insignia while riding motorcycles in northeast Ohio. He testified that one of the Hells Angels members, Scott Stage, punched him, then struck him over the head with something metal, causing a cut that required stiches and left a permanent indentation on his forehead. A jury convicted Mr. Stage of felonious assault, and he has appealed. This Court affirms because the conviction was supported by sufficient evidence and was not against the manifest weight of the evidence, Mr. Stage was not prejudiced by the admission of a 911 recording, and his lawyer was not ineffective.

BACKGROUND

{¶2} On September 3, 2010, Mr. Keresztesi made arrangements to meet with some representatives of the Hells Angels of Cleveland at the Rockne's restaurant on State Route 18 at

Interstate 71. He called his friend Victor Latori and asked him to meet him at Rockne's as well. Mr. Keresztesi testified that he did not know who to expect at the meeting, but that someone from the Hells Angels was going to be there to discuss whether members of the Coffin Cheaters would be permitted to display their insignia while riding motorcycles in the northeast Ohio area. Mr. Keresztesi testified that the members of the Coffin Cheaters Motorcycle Club had not publically worn the group's insignia for many years. According to Mr. Keresztesi, when his club started wearing the insignia again in the summer of 2010, he received several calls from unnamed people warning him that he must discuss the issue with the Hells Angels. Mr. Keresztesi testified that, as he understood the rules of motorcycle clubs in this area, other clubs cannot display a club insignia without paying a fee to the local Hells Angels. Mr. Keresztesi agreed to meet with representatives of the Hells Angels to explain that the Coffin Cheaters were not the type of motorcycle club that should have to pay the fee.

{¶3} Although Mr. Keresztesi and Mr. Latori are members of the Coffin Cheaters Motorcycle Club, they both drove cars to Rockne's that evening. Mr. Keresztesi testified that he and Mr. Latori approached three men standing in an adjacent parking lot near three Harley Davidson motorcycles. According to Mr. Keresztesi, as he approached, he realized that he had met two of the men before. Scott Stage and Justin Seliskar both shook hands with Mr. Keresztesi, and he introduced them to Mr. Latori. Mr. Keresztesi did not know the third biker, and that man did not join the conversation.

{¶4} According to Mr. Keresztesi, he began explaining to Mr. Stage that the Coffin Cheaters are not like other motorcycle clubs because its members are just old men riding with their kids in Medina, Wayne, and Holmes Counties. Mr. Stage then asked Mr. Keresztesi a question and, while Mr. Keresztesi was looking away, Mr. Stage "sucker punched" him in the

eye. Mr. Keresztesi said that he "rocked back and forth" and covered his eyes with his hands. When he moved his hands, he saw Mr. Stage reach into his jacket and pull something out. Mr. Stage then slammed the object into the top of Mr. Keresztesi's head as Mr. Keresztesi tried to turn away. Mr. Keresztesi was not sure what the object was, but he thought it was made of metal. Mr. Keresztesi testified that "[i]t thumped" "like hitting the side of a big garbage can." He said that Mr. Stage told him that if he caught him displaying the Coffin Cheaters patch he would kill him. Then Mr. Stage and the other bikers drove away, and Mr. Keresztesi and Mr. Latori went back to their cars and called 911.

## SUFFICIENCY

**{¶5}** Mr. Stage's first assignment of error is that there was insufficient evidence to find him guilty of felonious assault because Mr. Keresztesi did not suffer serious physical harm. Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo. *State v. Thompkins*, 78 Ohio St. 3d 380, 386 (1997); *State v. West*, 9th Dist. No. 04CA008554, 2005–Ohio–990, ¶ 33. We must determine whether, viewing the evidence in a light most favorable to the prosecution, it could have convinced the average finder of fact of his guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

**{¶6}** Under Section 2903.11(A)(1) of the Ohio Revised Code, "[n]o person shall knowingly . . . [c]ause serious physical harm to another . . . ." "Serious physical harm" is defined as "[a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement" or "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(d), (e).

{¶7} Francisco Ortiz, the physician's assistant who treated Mr. Keresztesi at the hospital on the night of the incident, testified that Mr. Keresztesi arrived by ambulance and presented with bruising and swelling on his right cheek and a three-centimeter laceration on his forehead. Mr. Ortiz closed the laceration with 11 stiches and ordered a head CT, but Mr. Keresztesi refused the test. Mr. Keresztesi testified that his right eye had swelled shut after the incident and when it opened again, he had a "floater" in his vision "like a big snowflake." He also testified that the injury still caused him headaches at the time of trial and the cut to his forehead left a permanent indentation, which he showed to the jury. As there was evidence of "some permanent disfigurement," there was sufficient evidence to support a conviction for felonious assault. R.C. 2901.01(A)(5)(d). Mr. Stage's first assignment of error is overruled.

## MANIFEST WEIGHT OF THE EVIDENCE

{¶8} Mr. Stage's fourth assignment of error is that his conviction is against the manifest weight of the evidence. If a defendant argues that his conviction is against the manifest weight of the evidence, this Court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App. 3d 339, 340 (9th Dist. 1986).

{¶9} Mr. Stage has argued that the jury could not have reasonably believed that Mr. Keresztesi suffered a prolonged and intractable injury as a result of this incident. In relation to this assignment of error, he has made no mention of whether the jury could have reasonably believed that Mr. Keresztesi suffered any permanent disfigurement.

{¶10} Mr. Keresztesi testified that he had a "floater" in his eye that was caused by the punch, but later testified that such a thing could be caused by his age. He also testified that he suffers from headaches as a result of the incident with Mr. Stage. Mr. Stage has pointed out that no doctor testified about the injury or any lasting effects of it, Mr. Keresztesi refused to submit to the CT scan ordered by the physician's assistant on the day of the incident, and he did not produce any receipts or other evidence of additional treatment. His argument is essentially that the only evidence of serious physical harm came from Mr. Keresztesi, whose testimony was "fraught with inconsistencies" about the background of the meeting at Rockne's and the history of some animosity between him and the Hells Angels of Cleveland. Mr. Keresztesi's testimony was not "fraught with inconsistencies" and there was objective evidence of some permanent disfigurement. This is not the rare case in which the jury has clearly lost its way and created a manifest miscarriage of justice requiring a new trial. The jury did not lose its way in determining that Mr. Stage knowingly caused serious physical harm to Mr. Keresztesi. Mr. Stage's fourth assignment of error is overruled.

## THE 911 RECORDING

{¶11} Mr. Stage's second assignment of error is that the trial court incorrectly admitted a recording of a call Mr. Latori placed to a 911 operator following the alleged attack. The trial court determined the recording was admissible under the excited utterance exception to the hearsay rule. Mr. Stage has argued that the content of the 911 recording was not an excited utterance under Rule 803(2) of the Ohio Rules of Evidence because it was the result of reflective thought and, because Mr. Latori did not testify at trial, it contained testimonial statements in violation of *Crawford v. Washington*, 541 U.S. 36 (2004).

**{¶12}** "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Under Evidence Rule 802, hearsay is generally inadmissible unless it falls within a recognized exception. Under Evidence Rule 803(2), an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Exited utterances "are not excluded by the hearsay rule, even though the declarant is available as a witness." Evid. R. 803.

**{¶13}** Mr. Stage's argument is not clear, but seems to be limited to challenging the amount of time that passed between the startling event and the contested statements. Although he has argued that the recorded statements cannot be admissible as excited utterances because they were the result of reflective thought, he has not pointed to any evidence in the record indicating how much time passed between the alleged attack and the 911 call. The evidence suggests, however, that Mr. Latori placed the call within moments of the incident. During the call, he asked for an ambulance and explained that they were trying to put pressure on the wound, but they were having trouble controlling the bleeding from his friend's head. Given the caller's tone of voice and the statements about not being able to stop the bleeding, the evidence supports the trial court's finding that the recorded statements were made while Mr. Latori was still in a state of nervous excitement created by observing a startling event. To the extent that Mr. Stage's second assignment of error addresses hearsay, it is overruled.

**{¶14}** Mr. Stage has also challenged the admission of the 911 recording based on the fact that Mr. Latori did not testify at trial. The Confrontation Clause prohibits out-of-court testimonial statements "unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). In

*Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court described testimonial versus non-testimonial statements. The Court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. In *Davis*, the Supreme Court wrote that "the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827.

{¶15} More recently, in *Michigan v. Bryant*, ___ U.S. ___, 131 S. Ct. 1143, 1156 (2011), the Supreme Court explained that, "when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Id.* at 1162. The Court also explained that "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public." *Id.*

{¶16} Mr. Stage has broadly challenged the entire recording rather than objecting to the admission of certain statements he believes are testimonial. An objective review of the recording indicates that the primary purpose of the call was to address an ongoing emergency. Mr. Latori asked the dispatcher to send an ambulance because they had been attacked by Hells Angels and needed help. He explained that his friend had a significant wound to his head and that they could not stop the bleeding.

**{¶17}** The statements are non-testimonial as the circumstances indicate they were aimed at helping the dispatcher address an ongoing medical emergency. As the call continued, the dispatcher asked additional questions about the attackers. Mr. Latori told her that there were three of them, he did not know who they were, they had left the scene, and he did not know which direction they went. These questions and responses were objectively aimed at determining whether the physical threat continued for these victims, the police, or the public at large. Therefore, Mr. Latori's statements are non-testimonial and do not violate the Confrontation Clause. Mr. Stage's second assignment of error is overruled.

INEFFECTIVE ASSISTANCE OF COUNSEL

**{¶18}** Mr. Stage's third assignment of error is that his lawyer was ineffective for failing to object to an improper question by the prosecutor. To establish that his lawyer was ineffective, Mr. Stage "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St. 3d 118, 2008–Ohio–3426, ¶ 204 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *State v. Bradley*, 42 Ohio St. 3d 136, paragraph two of the syllabus (1989)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

**{¶19}** Mr. Ortiz testified that, while he was treating Mr. Keresztesi on the night of the incident, Mr. Keresztesi told him that the gash in his head was caused by someone hitting him with a metal object. The State asked Mr. Ortiz whether he believed what Mr. Keresztesi told

him, and Mr. Ortiz answered affirmatively. Mr. Stage's lawyer did not object to the question about whether Mr. Ortiz believed Mr. Keresztesi. Mr. Stage has argued that he was deprived of the effective assistance of counsel because of his lawyer's failure to object to that question. He has argued that allowing Mr. Ortiz to vouch for Mr. Keresztesi's credibility encouraged the jury to believe Mr. Keresztesi's other testimony about the permanence of his injuries.

{¶20} Mr. Keresztesi's credibility on that point was bolstered because he was not the only witness who testified that his attacker used some kind of weapon. Brian Kenney, an eyewitness who did not know any of the men involved in the altercation, testified that he saw one of the bikers repeatedly striking Mr. Keresztesi. He testified that he heard someone yell "[d]on't fly that shit" then saw one of the bikers "[come] up from behind one of the men and hit him in the head repeatedly with something." Although he could not see what was in the biker's hand, Mr. Kenney testified that "it looked like he had something in his hand and the way that he was swinging his fist at the person, it looked like he had something in his hand that was hitting someone." Mr. Kenney then demonstrated the swinging motion for the jury. Holly Hofstetter, a woman who was with Mr. Kenney, also testified. Although she did not see a weapon, she testified that she saw the man hit Mr. Keresztesi and that it did not sound like a normal punch, but instead made a very loud sound when it struck his head. There is nothing in the record to suggest that the result of Mr. Stage's trial would have been different if the jury had not heard Mr. Ortiz testify that he believed his patient's statement about the cause of his head wound. Mr. Stage's third assignment of error is overruled.

## CONCLUSION

{¶21} Mr. Stage's first and fourth assignments of error are overruled because his conviction is supported by sufficient evidence and is not against the manifest weight of the

evidence. His second assignment of error is overruled because the trial court properly determined that the recording of Mr. Latori's 911 call was admissible under the excited utterance exception to the hearsay rule and it contained no testimonial statements. His third assignment of error is overruled because his lawyer was not ineffective. The judgment of the Medina County Common Pleas Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CLAIR E. DICKINSON
FOR THE COURT

WHITMORE, P. J.
MOORE, J.
CONCUR.

APPEARANCES:

DAVID L. DOUGHTEN, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW KERN, Assistant Prosecuting Attorney, for Appellee.