[Cite as *State v. Williams*, 2015-Ohio-3578.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| DONALD MAURICE WILLIAMS | : | Case No. 2014CA00199 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of Common Pleas, Case No. 2014CR1056

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      August 31, 2015

APPEARANCES:

For Plaintiff-Appellee                 For Defendant-Appellant

JOHN D. FERRERO
Prosecuting Attorney

By: RONALD MARK CALDWELL
Assistant Prosecuting Attorney
110 Central Plaza South, Suite 510
Canton, OH 44702

JACOB T. WILL
116 Cleveland Ave. NW
Suite 808
Canton, OH 44702

*Baldwin, J.*

{¶1}　Appellant Donald Maurice Williams appeals a judgment of the Stark County Common Pleas Court convicting him of attempted murder (R.C. 2923.02(A), R.C. 2903.02(A)), felonious assault (R.C. 2903.11(A)(1)), and aggravated burglary (R.C. 2911.11(A)(1)).　Appellee is the State of Ohio.

### STATEMENT OF THE FACTS AND CASE

{¶2}　During the early morning hours of June 29, 2014, Melissa Johnston knocked frantically on the front door of the Canton residence of Clifford Jordan. Jordan's friend Joe Sherrell, who was visiting from Tennessee, answered the door to find a bloodied and scared Johnston.　Sherrell immediately got Jordan to come to the door. Johnston repeatedly told the men, "He's going to kill me."　They observed cuts on her legs and arms.　Before they could close the door, appellant pushed Jordan aside and entered the residence.

{¶3}　Jordan warned appellant that he was calling the police.　Appellant pushed Johnston on a couch, grabbed her, tore her shirt off, and said that he was going to get her.　Appellant was holding a knife with a blade four to six inches long.　The men tried to talk appellant out of hurting Johnston, while Johnston continued screaming that appellant was going to kill her.　Finally Jordan called his dog, a Lab-Rottweiler mix, from the basement.　Upon seeing the dog, appellant fled.　Jordan shut the front door and called 911.

{¶4}　Canton Police Officer James Nixon responded to the call.　When he arrived, paramedics were attending to Johnston, who was in the ambulance.　After speaking to Jordan and Sherrell, Officer Nixon spoke to Johnston in the ambulance.

She told him that she stays with appellant but they do not have a permanent residence, they move from house to house together. They were staying at a home around the corner from Jordan's home. She argued with appellant about whether she was involved with or talked to another man, and he assaulted her, giving her a black eye and stab wounds. She told the officer that appellant was intoxicated. She broke free, and fled to Jordan's house for help, where appellant followed her and continued the attack. Officer Nixon noted that Johnston had a serious stab wound to her neck, and other cutting wounds to the back of her neck, her thigh, and her abdomen.

{¶5}  Johnston was transported to Aultman Hospital where she was treated for 23 lacerations. Ten of the wounds were closed by stitches, and she had numerous other abrasions, scrapes and bruises covering her body.

{¶6}  Appellant was indicted with attempted murder, felonious assault, and aggravated burglary, all including repeat violent offender (RVO) specifications. The case proceeded to jury trial. During the reading of the indictment, the court inadvertently read the RVO specifications, which had been severed for purposes of trial and were to be tried to the court. The court declared a mistrial.

{¶7}  A second jury trial commenced one week later. Appellant was found guilty of all charges by the jury, and the court found appellant guilty of the RVO specifications. He was sentenced to an aggregate prison term of nineteen years.

{¶8}  Appellant assigns two errors on appeal:

{¶9}  "I.    APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES AGAINST HIM WAS VIOLATED WHEN THE TRIAL COURT PERMITTED THE ADMISSION OF HEARSAY STATEMENTS.

{¶10} "II. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

I.

{¶11} Appellant argues that the admission of Johnston's statement to Officer Nixon violated his Sixth Amendment right to confront witnesses. Johnston was unavailable to testify at trial.

{¶12} In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court concluded that the Sixth Amendment prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 54. Applying that definition to the facts in *Crawford,* the court held that statements by a witness during police questioning at the station house were testimonial and thus could not be admitted. *Id.*

{¶13} In *Davis v. Washington* and *Hammon v. Indiana,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), which the U.S. Supreme Court decided together, the court concluded that statements are not testimonial if the primary purpose of the interrogation by law enforcement was to enable police to respond to an ongoing emergency. Statements are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish past events that are potentially relevant to later criminal prosecution. *Id.* at 822.

{¶14} The Supreme Court further expounded on the primary purpose test in *Michigan v. Bryant,* 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). In that case,

the victim of a shooting made statements to the police within five to ten minutes of the shooting, which ultimately resulted in his death.  The armed shooter remained at large. In finding the victim's statements to the police to be non-testimonial, the court explained that the existence of an "ongoing emergency" at the time of the encounter is among the most important circumstances informing the interrogation's "primary purpose." *Id.* at 361. Whether an emergency exists and is ongoing is a highly context-dependent inquiry.  *Id.* at 363.  An assessment of whether an emergency threatening the police and public is ongoing cannot narrowly focus on whether the threat to the first victim has been neutralized because the threat to the first responders and public may continue. *Id.* An  emergency's duration and scope may depend in part on the type of weapon involved.  *Id.* at 364.

{¶15} A victim's medical condition is also important to the primary purpose inquiry to the extent that it sheds light on the victim's ability to have any purpose at all in responding to police questions and on the likelihood that any such purpose would be testimonial.  *Id.* at 364-365.  The victim's condition also provides an important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public. *Id.*  at 365.  An emergency does not necessarily last the entire time that a perpetrator is on the loose, but trial courts can determine in the first instance when an interrogation transitions from non-testimonial to testimonial.  *Id.*

{¶16}  Finally, another factor to consider pursuant to the "primary purpose" test is the encounter's informality.  *Id.* at 366.  Formality suggests the absence of an emergency, but informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent.  *Id.*  However, the court distinguished the facts in

*Bryant,* where the questioning occurred in an exposed public area, before emergency medical services arrived, and in a disorganized fashion, from the formal station-house interrogation in *Crawford. Id.*

{¶17} The circumstances reflect that at the time police spoke to Johnston, there was an ongoing emergency. Officer Nixon arrived on the scene about seven minutes after dispatch received the 911 call. Johnston had been attacked by a man armed with a knife in one location, and he had pursued her into the street and into another home. She indicated to police that appellant was intoxicated. He fled on foot with the knife in his possession. It was night-time, and there were known "flop houses" in the area which could possibly provide cover for the armed assailant. The officer testified that he did not have a reason to believe that the victim was still in danger from appellant, but there "were other issues going on in the neighborhood outside at that time." Tr. (II) 66. After speaking to Johnston, police first secured a home in the area which had high bushes that might conceal the presence of an assailant. Officer Nixon then noticed that the door to the duplex where the attack began was open, and he radioed for backup and a canine unit to search the home. The actions taken by the officers after speaking to Johnston clearly indicate that they perceived an ongoing emergency until they could determine whether appellant was still present in the neighborhood.

{¶18} In addition, Johnston's medical condition lends itself to a conclusion that her statements were non-testimonial. She was in pain, scared and upset when Officer Nixon spoke to her. She had been stabbed 23 times and the officer was concerned about a stab wound to her neck. Her condition further indicates that appellant posed a

threat to first responders and others in the area, as he repeatedly attacked her with a knife in more than one location.

{¶19} Finally, the setting in which Johnston was questioned was informal. Unlike *Bryant,* emergency personnel had arrived on the scene before police spoke to Johnston. However, the questioning occurred shortly after the attack and while the victim was still in an ambulance in the neighborhood where the incident took place, not in a more formal setting such as the police station.

{¶20} The court did not err in finding that the statement Johnston made to the police was non-testimonial in nature, and its admission did not violate the Confrontation Clause. The first assignment of error is overruled.

II.

{¶21} In his second assignment of error, appellant argues that the judgment is against the manifest weight and sufficiency of the evidence, specifically as to the identity of the perpetrator. He argues that the identification offered by Jordan and Sherrell was unreliable and equivocal, and that there were discrepancies in their testimony concerning what both Johnston and appellant were wearing.

{¶22} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St. 3d 380, 387,

1997-Ohio-52, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

{¶23} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

{¶24} Johnston identified appellant to Officer Nixon as the person who attacked her. She knew appellant, as they were living together and romantically involved at the time of the incident. Jordan's in-court identification of appellant was equivocal due to appellant's growth of a beard. He testified that appellant looked familiar, but he was not sure about the beard. However, Sherrell positively identified appellant as the perpetrator, noting that he didn't have a beard at the time of the incident. While there were discrepancies in the testimony of the two men regarding the clothing worn by Johnston and appellant, they testified that they were paying more attention to appellant's knife and Johnston's medical condition than to what they were wearing.

{¶25} The evidence was sufficient to identify appellant as the perpetrator of the offenses, and the judgment is not against the manifest weight of the evidence.

{¶26} The judgment of the Stark County Common Pleas Court is affirmed. Costs are assessed to appellant.

By: Baldwin, J.

and Delaney, J. concur.

Hoffman, P.J. concurs in part
and dissents in part.

*Hoffman, P.J., concurring in part and dissenting in part*

**{¶27}** I concur in the majority's analysis and disposition of Appellant's second assignment of error. However, I respectfully dissent from the majority's disposition of Appellant's first assignment of error.

**{¶28}** Unlike the majority [and trial court], I do not find the circumstances herein justify the characterization of Johnston's statements to Officer Nixon as non-testimonial due to the existence of an "ongoing emergency".

**{¶29}** I find the majority's conclusion based upon the primary purpose test set forth in *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed. 2d 93(2011), leads me to a different conclusion.[1] I find the factual distinctions between *Bryant* and the case sub judice significant.

**{¶30}** First and foremost is that the weapon involved herein was a knife whereas the weapon in *Bryant* was a gun. Second, unlike the scenario in *Bryant*, here Johnston was already in the ambulance and being attended to by medical personnel at the time Officer Nixon was questioning her.

**{¶31}** The object of Appellant's violent act was clearly focused on Johnston. Appellant took no violent action against either Jordan or Sherrell, nor did the nature of the attack suggest a random, unprovoked threat against the general public.

**{¶32}** Appellant, having been told Jordan was calling the police and upon seeing Jordan's dog, fled. At that point, it seems unlikely Appellant would attempt to re-enter Jordan's residence to continue his assault on Johnston.

---

[1] Of the eight justices participating in *Bryant*, two dissented.

**{¶33}** By the time Officer Nixon arrived, Johnston was already being attended to by medical personnel and had been secured in the ambulance. This is a far different scenario from that in *Bryant* where the victim was found by the police lying in a gas station parking lot bleeding from a mortal gunshot wound.

**{¶34}** Of significance to the majority in *Bryant,* in concluding the emergency encompassed a potential threat to the police and the public, was the fact the case involved a gun; therefore, the physical separation between the victim and the defendant was not necessarily sufficient to end the threat. In contrast, I find the physical separation between Appellant and Johnston was sufficient to end the potential threat given the fact the weapon involved, a knife, and the injuries inflicted during the attack required close proximity between Appellant and Johnston or, for that matter, any other person. Appellant fled before the ambulance or police arrived. Unlike situations we too frequently see reported on the national news involving random mass shootings in public locations - this attack was clearly focused on one individual and involved a weapon less potentially threatening to armed police officers. I find the threat to the first responders and general public was insufficient to find an ongoing emergency existed.

**{¶35}** Also of significance to the majority in *Bryant* was the medical condition of the victim. Unlike the medical condition of the victim in *Bryant,* whose response to questions by the police were punctuated by his questions about when emergency medical services would arrive, Johnston was already being attended to by medical personnel and secured in the ambulance. While the circumstances lacked the "formality" attendant to the station-house interview in *Crawford*, it was more formal than the unsafe, not tranquil environment existent in *Davis v. Washington,* and *Hammon v.*

*Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed. 224 (2006). I find the "primary purpose" of the questioning of Johnston would have been understood by her and Officer Nixon to establish or prove past events potentially relevant to later criminal prosecution.

{¶36} In conclusion, I find Johnston's statements to Officer Nixon were testimonial and were improperly admitted in violation of Appellant's Sixth Amendment to confront witnesses.