# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DRAKILE LEROY JONES,

        Defendant-Appellant.

UNPUBLISHED
February 20, 2018

No. 334635
Wayne Circuit Court
LC No. 16-001902-01-FC

Before: SAWYER, P.J., and MURRAY and STEPHENS, JJ.

PER CURIAM.

Defendant was convicted by a jury of first-degree felony murder, MCL 750.316; armed robbery, MCL 750.529; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to life in prison without parole for the first-degree murder conviction, 25 to 50 years for the armed robbery conviction, and the mandatory two-year consecutive term of imprisonment for the felony-firearm conviction. He now appeals as of right claiming that the trial court's decision to admit hearsay testimony violated his constitutional rights to due process and confrontation and that he is therefore entitled to a new trial. We disagree and affirm his convictions.

The evidence at trial demonstrated that defendant had met a friend, Justin Harris, on January 26, 2016, and arranged to meet later that evening at Harris's home. Defendant called late that night to confirm the meeting. He asked Harris about "hitting licks" (robbing someone to get money) and whether he had a "burner" (a gun). Defendant also informed Harris that he intended to bring a friend, Robert Carter, with him. Harris expressed reluctance to have the friend come over, but defendant assured Harris that his friend was completely loyal. Late that night defendant and Carter arrived at Harris's home where Harris was present with his cousin, Ryan Shaw, and a friend, Anthony Cox-Rogers. Defendant and Harris talked again about "hitting licks" and defendant again asked Harris if he had a gun; Harris denied having a gun, but he observed the handle of a handgun sticking out of Carter's front hoodie pocket. After 15 or 20 minutes, defendant and Carter left. Harris testified that while defendant and Carter were visiting, and when they left, the black Chevrolet HHR vehicle owned by Phillip Pentecost, his neighbor and friend, was parked two houses away with its engine running. A short time later, Harris heard a gunshot, a scream that he believed came from Pentecost, and another gunshot. When he looked outside, he saw Pentecost's HHR being driven down the street with the van defendant and Carter had arrived in driving ahead of it. Harris went outside and found Pentecost on the ground

-1-

with two gunshot wounds, one to his abdomen and one to his head. Harris called 911 and the police and medical personnel responded. Harris found a cell phone next to Pentecost's body that he assumed was Pentecost's. The police relieved Harris of this cell phone and determined that it belonged to Carter.

The statements defendant contests in this appeal were made by Carter to his friend Taevion Williams shortly after the robbery and murder had taken place. Williams testified that he knew both defendant and Carter from high school. Within an hour or two after the murder occurred, Williams received a telephone call from Carter; he recognized his voice and he also saw Carter's name appear on the screen when the telephone was ringing. Carter sounded scared or frantic. He said he needed somewhere to go and asked if he could come to Williams's home. When Carter arrived at Williams's home, he called Williams again and asked him to come outside; Williams found Carter seated alone in a black Chevy. Carter told Williams he needed somewhere to put the vehicle, and Williams told him he could put it around the corner. Together they drove the car about two blocks away, parked it behind a store, and then walked back to Williams's house. Then they both went to sleep. When they awoke the next morning, Carter told Williams that he had participated in a robbery and someone had been shot. Williams specifically testified: "Carter told me that him and [defendant] was on the west side, and they were looking to make some money." The prosecutor confirmed this with the following questions:

> *Q.* [Assistant Prosecutor] Did he say that he and [defendant] were looking to make some money?
>
> *A.* [Williams] Yes.
>
> *Q.* Did he say that he and [defendant] were looking to rob someone?
>
> *A.* Yes.
>
> *Q.* He used those words?
>
> *A.* Yes
>
> *Q.* What did he say then?
>
> *A.* He said that they had found someone in particular who they were going to rob.
>
> *Q.* I'm going to stop you there. Did he tell you how they picked that person?
>
> *A.* No. He just said he seen someone, then he chose.
>
> *Q.* What did he say next?
>
> *A.* He said that [defendant] had told him that that's the one who they going to rob. Carter said he don't think that's a good idea that that's what he should do.

And [defendant] told him quit being scared or quit acting like you don't want to go.

They had that little dispute, and he said that [defendant] told him that if he wouldn't come, he would turn the gun against him.

*Q.* Are those the exact words that Carter used when he was telling you that?

*A.* I'm not sure what his exact words was. That's what he was saying. He said [defendant] told him that if he wouldn't come, he would use the gun against him, or he threatened him to come with him.

*Q.* That if Carter didn't go along with the robbery, [defendant] would turn the gun against him?

*A.* Yes, sir.

*Q.* After he told you about that interaction where [defendant] threatened Carter, did he go on to tell you anything else?

*A.* Yes. He told me that they went to the car, and [defendant] had shot the boy, and he told me he had took off in the car afterward.

Williams further testified that he then told Carter he would have to leave. Carter called someone and was subsequently picked up by an unseen person in a gray or silver sedan. Later that evening, Carter came back to Williams's house and asked if Williams would help him burn the black Chevy. Williams refused and again told Carter to leave. Carter got back into the same silver or gray sedan Williams had seen earlier; he could not see who else was in the car. Williams also agreed that Carter had previously sent him photographs of a firearm that were posted on Facebook. He explained to Williams that "his Dad had some guns, and he was going to take them."[1]

Defendant claims that the trial court's decision to admit Carter's statements through the testimony of Williams violated his rights to due process and confrontation. We disagree.

This Court reviews a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003). An abuse of discretion is found when the court's decision is outside the range of principled outcomes. *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013). Nonetheless, when "the decision involves a preliminary question of law, which is whether a rule of evidence precludes

---

[1] Williams either did not correctly remember Carter's statement regarding the source of the guns, or Carter incorrectly identified the source of the guns, because the evidence showed that Carter had stolen two handguns from his uncle, not his father.

admissibility, the question is reviewed de novo." *McDaniel*, 469 Mich at 412. Defendant objected at trial to the admission of Carter's statements, so the issue is preserved. "However, if an evidentiary error is a non-constitutional, preserved error, then it 'is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative.'" *Musser*, 494 Mich at 348, quoting *People v Krueger*, 466 Mich 50, 54; 643 NW2d 223 (2002). The trial court ruled that Carter's statements to Williams were admissible as statements against his penal interest.

MRE 804(B)(3) provides:

> **(b) Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

> (3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, *or so far tended to subject the declarant to civil or criminal liability*, or to render invalid a claim by the declarant against another, *that a reasonable person in the declarant's position would not have made the statement unless believing it to be true*. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. [Emphasis supplied.]

In *People v Taylor*, 482 Mich 368; 759 NW2d 361 (2008), our Supreme Court examined the application of MRE 804(b)(3) in light of United States Supreme Court authority. Our Supreme Court determined that the manner in which the evidentiary rule is applied depends upon whether the statements in question are testimonial or nontestimonial, and that determination, in turn, depends upon whether the statements were made in a testimonial setting or not. As the *Taylor* Court observed, in *Crawford v Washington*, 541 US 36, 68; 124 S Ct 1354; 158 L Ed 2d 177 (2004), the United States Supreme Court stated:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

The *Crawford* Court found the statements in question to be testimonial: they were offered by a potential suspect while in police custody. *Crawford*, 541 US at 65.

Subsequently, in *Davis v Washington*, 547 US 813; 126 S Ct 2266; 165 L Ed 2d 224 (2006), the Supreme Court held that statements to a 911 operator, even though made in response to questioning, were not testimonial because the declarant "was speaking about events *as they were actually happening*" (rather than reciting what had occurred in the past), because the declarant "was facing an ongoing emergency," and because the inquiries of the 911 operator were made to "elicit[] statements [that] were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." *Davis*, 547 US at 827; emphasis in original.

In *Taylor*, one of the defendants who was involved in the kidnapping of the victim called a friend and told him about the kidnapping and subsequent events that resulted in the victim's murder. Our Supreme Court found that the defendant's statements to his friend were not testimonial: as in the present case, the inculpatory statements of the codefendant were admitted through the testimony of an acquaintance and were not made to a law enforcement officer.[2] *Taylor*, 482 Mich at 370, 374. Because the contested statements were not testimonial, they are to be evaluated pursuant to the standards applicable to the admissibility of statements under MRE 804(b)(3). *Taylor*, 482 Mich at 378. That applicable standard, according to the *Taylor* decision, is the standard that was applied in *People v Poole*, 444 Mich 151; 506 NW2d 505 (1993). In *Poole*, our Supreme Court reasoned that part of the declarant's statement was against his penal interests and therefore would not have been made unless it was true. *Id*. at 159. The Court noted that the other, non-inculpatory portions of the declarant's statement (or the "carry-over" portion as the Court termed it) were not directly addressed by MRE 804(b)(3). Nevertheless, the Court concluded that, in the context of the facts before it, those portions were also admissible. The Court stated:

> [W]here, as here, the defendant's inculpation of an accomplice is made in the context of a narrative of events, at the declarant's initiative without any prompting or inquiry, that as a whole is clearly against the declarant's penal interest and as such is reliable, the whole statement – including portions that inculpate another – is admissible as substantive evidence at trial pursuant to MRE 804(b)(3). [*Id*. at 161.]

In this case, Carter's inculpatory statements were made spontaneously to a friend, not to a law enforcement officer, and were admitted through the friend's testimony. Carter's statements were therefore nontestimonial. *Crawford*, 541 US at 68; *Taylor*, 482 Mich at 379, quoting *Poole*, 444 Mich at 161.[3] Furthermore, Carter inculpated himself by stating that he and

---

[2] "Scarber's statements to Ervin were nontestimonial because they were made informally to an acquaintance, not during a police interrogation or other formal proceeding . . . or under circumstances indicating that their 'primary purpose' was to 'establish or prove past events potentially relevant to later criminal prosecution'[.]" *Taylor*, 482 Mich at 378; citations omitted.

[3] See also: *People v Bennett*, 290 Mich App 465, 483; 802 NW2d 627 (2010) ("Thus, our Supreme Court has ruled that a statement made to an acquaintance, outside a formal proceeding,

defendant had been "looking to make some money," that they found a particular person that they intended to rob, that Carter specifically said that he saw the person and he chose that person to rob (although he then said that defendant had told him – Carter – who they were going to rob), that defendant threatened him to make him participate in the robbery, that they went to the car, that defendant shot the man, and that Carter drove off in the man's car. These statements were then corroborated by Carter's efforts to involve Williams in hiding and subsequently disposing of the vehicle. Although Carter's statements did attempt to place most of the blame on defendant, Carter did admit that he had been in on the plan to rob *someone* from the beginning, and his reluctance to participate in the robbery of Pentecost may well have stemmed solely from not wanting to rob that particular person at that particular location (a reasonable concern given that Harris, Shaw, and Cox-Rogers were all witnesses who could potentially identify Carter and defendant). Moreover, his attempt to place the blame for the shooting on defendant was made to Williams, not to the police in an effort to curry favor or get a lighter sentence or other consideration. Thus, Carter's statements were exceptions to the hearsay prohibition because they were statements against his penal interest.

These statements by Carter to Williams clearly satisfied MRE 804(b)(3). The declarant, Carter, was unavailable because he was a codefendant who was tried separately and who could invoke his Fifth Amendment right not to testify. Furthermore, Carter's statements "tended to subject the declarant to civil or criminal liability" such that he would not have made them unless he believed them to be true. Finally, Carter's statements not only inculpated him in the criminal enterprise, but they were presented to Williams in a narrative of the events of the robbery and murder. There is no indication that defendant's statements were made in response to questioning, but rather they appear to have been an attempt to explain to Williams what had occurred and why Carter needed his assistance. Therefore, as in *Poole*, "the whole statement – including portions that inculpate another – is admissible as substantive evidence at trial pursuant to MRE 804(b)(3)." *Poole*, 444 Mich at 161.

Defendant argues that admission of the statements deprived him of his right to confront and cross-examine the declarant. He also argues that consideration of the relevant factors shows that the statements were not reliable. However, as our Supreme Court made clear in *Taylor*, with respect to a nontestimonial statement, the reliability of the statement is established if the statement satisfies MRE 804(b)(3); further tests of reliability are not required. "Because the hearsay statements in this case were nontestimonial, they do not implicate the Confrontation Clause . . ., and their admission is governed solely by MRE 804(b)(3)." *Taylor*, 482 Mich at 374. Carter's statements are nontestimonial and they satisfy the requirements of MRE 804(b)(3). Therefore, defendant's arguments regarding confrontation, cross-examination, and other tests of reliability are irrelevant to the admissibility of Carter's statements. The hearsay exception

_____

is a nontestimonial statement and may be admitted as substantive evidence at trial pursuant to MRE 804(b)(3).").

concerning statements against penal interest is a well-established hearsay exception.[4]   We therefore conclude that the trial court properly admitted Carter's statements through Williams's testimony pursuant to MRE 804(b)(3).

Affirmed.

/s/ David H. Sawyer
/s/ Christopher M. Murray
/s/ Cynthia Diane Stephens

---

[4] We note that our Supreme Court in both *Poole*, 444 Mich at 163, and *People v Washington*, 468 Mich 667, 672; 664 NW2d 203 (2003), have suggested, without deciding, that the statements against penal interest exception is a firmly established hearsay exception.