# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01579-COA

**CARLOS C. JONES A/K/A CARLOS JONES**  APPELLANT
**A/K/A CARLOS J. JONES**

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/18/2016 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | JEFFERSON DAVIS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/08/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., BARNES AND WILSON, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.     Carlos Jones appeals his conviction for second-degree murder, alleging three issues:

(1) the trial court erred in admitting a video depicting testimonial evidence; (2) the trial court

erred in refusing to allow his witness to testify as an expert; and (3) his trial counsel was

constitutionally ineffective.  Finding no reversible error, we affirm.

FACTS

¶2.     At the time of the events giving rise to trial, Jones and his wife, Tabatha Smith, were

living with Tabatha's two children in Jefferson Davis County, Mississippi. Jones testified that on the morning of December 5, 2014, he awoke, got out of bed, and left his and Tabatha's bedroom to wake the children. Upon returning to the bedroom, he and Tabatha—who was awake but still in bed at this point—began "fussing."[1] Tabatha rolled over onto the handgun that Jones kept under his pillow and said, "You and this gun." Jones pulled the gun out from under the pillow and assured Tabatha that it was not loaded. He then put the gun in the back pocket of his pants, but it fell through a hole in the pocket and hit the floor. Jones later testified at trial as follows:

BY DEFENSE COUNSEL

Q. And you're not saying [the gun] fired when it hit the floor?

A. I'm not saying it fired when it hit the floor. I'm saying when I grabbed it, I don't know how did I [sic] grab it, the gun went off. I know [sic]. I didn't even know how many times she was shot until, you know, I - - I just - - when she - - when that gun went off, she sa[id], "I told you." I looked at my wife. She was bleeding.

* * * *

A. When I was coming up, the gun went off.

BY THE PROSECUTOR

Q: All right. So you - - you're saying apparently that you didn't even pull the trigger.

A. I don't know how I retrieved that gun. . . .

_____

[1] At trial, Jones defined "fussing" as "[d]isagreeing about things" and just typical "banter" between husbands and wives.

2

\* \* \* \*

Q.   Well, where did you point the gun when you came up?

A.   I didn't - - I didn't know it hit her.  I just heard it go off.  She just said, "I told you."  I didn't point the gun.

\* \* \* \*

A.   In my attention [sic], I think the gun just shot.  I didn't pull no trigger on no gun [sic].  It was an accident.  It was an accident.

¶3.   According to Jones, Tabatha, upon realizing that she had been shot, said, "I told you." Jones asserted that Tabatha told him not to call 911 because it would take too long, so he dragged her out of the house and placed her into the back seat of his car.  Then, with Tabatha's two children in the front seat, he drove to Prentiss Regional Hospital.

¶4.   Jones testified that when he reached the emergency room, he shouted for help from a man standing nearby.  The man, later identified as Antonio McClendon, helped Jones alert the nurses, who loaded Tabatha into a wheelchair and admitted her.  Tabatha was still conscious at this point.

¶5.   McClendon later testified at trial that he had been standing outside of an apartment complex near the emergency room when Jones drove up.  He recognized Jones and Tabatha from meeting them on a prior occasion and walked over to the hospital to investigate. McClendon further testified:

Q.   Okay.  Did [Jones] tell you what had happened to her?

A.   After - - after we got her out [of the car and into the hospital], he was - - he was saying that, you know, there was some kind of - - it was early

3

in the morning. He was - - you know, they was just [sic], you know, having words I guess or whatever, and he was, like, he was playing with her with - - with the gun, you know, like, ["Y]ou going to get this right here. Now give me some,["] you know.

I guess something they always do [sic]. You know, I don't know. You know, that's what he was telling me. And he was, like, such and such, and the gun went off and shot her, like, three or four times.

Q.     Okay. That's what [Jones] told you?

A.     Yes, ma'am.

Q.     Did he tell you anything in particular about the condition of the gun?

A.     Yeah. He told [me] it was, like, the gun kind of messed up. It had like a little hair trigger, you know, like. Like, it just went off, and it got stuck, and that's how she got shot four or five times, or three or four times.

Finally, McClendon opined that Jones appeared to be high when Jones arrived at the hospital. He maintained that Jones acted as if he did not want to sign any papers, and that he believed Jones would have left the hospital if McClendon had not asserted that he needed to stay.

¶6.     Shortly after Tabatha was admitted, the hospital alerted law enforcement authorities. Officer David Marshall with the Prentiss Police Department was the first to arrive, and testified at trial that Jones told him the following:

[He told me t]hat he keeps a Hi-Point .45 underneath his pillow at home and that he retrieved it and placed it in his rear, right pocket, which had a hole in it, [and] that the firearm fell through the hole. He picked it up, and he said that he pointed towards his wife and said, "I told you it wouldn't fire," and once he did that, the weapon fired.

Jones gave the gun—which he had brought with him to the hospital—to Officer Marshall,

4

who secured it in his patrol vehicle.

¶7.    Subsequently, Deputy Denise Jackson and Investigator Charles Johnson, both with the Jefferson Davis County Sheriff's Department, arrived at the hospital. Deputy Jackson retrieved the gun from Officer Marshall and placed Jones into custody. Both Investigator Johnson and Deputy Jackson attempted to speak with Tabatha, but Investigator Johnson testified that "she was not really talking" and "the only thing she was saying was, 'Help me, help me, help me.'" Similarly, Deputy Jackson testified that when she went into the hospital room, all Tabatha said was "help me."

¶8.    Investigator Johnson obtained a search warrant for Jones and Tabatha's home, and he and Deputy Jackson conducted a search of the premises. Sometime thereafter, Jones was arrested on charges of "domestic violence, aggravated assault." Jones waived his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and wrote the following statement:

> [Tabatha] rolled over on my side [of the bed.] She said[, "Y]ou and this gun[."] I got my gun out from under my pillow and stuck it in my back pocket and it fell out[.] I picked it up and said[, "T]his gun ain't loaded[."]  When I turened[,] [sic] it went off[.] She said[, "I] told you[."] When I looked up[,] she was bleeding.

¶9.    On December 10, 2014, Investigator Johnson again attempted to speak to Tabatha. This conversation, which lasted fifty-five seconds, was video-recorded. The video depicts Investigator Johnson asking, "Tabatha, did Carlos shoot you?" Tabatha did not verbally respond. Investigator Johnson said, "Let me know by shaking your head or raising your hand." Tabatha lifted her hand slightly. Investigator Johnson then said, "Okay. How many

5

times he [sic] shoot you?" Tabatha moved her fingers.[2] Investigator Johnson said, "Okay. Thank you," and the video concluded.

¶10.    After fifteen days in the hospital, on December 20, 2014, Tabatha succumbed to her injuries. Dr. John Brentley Davis, a forensic pathologist and Deputy Chief Medical Examiner for the State of Mississippi, reviewed Tabatha's autopsy report[3] and testified that she had been struck by two bullets: one bullet hit Tabatha's left shoulder and the right side of her neck, and another bullet hit her right shoulder. As a result of the gunshots, Tabatha sustained injury to her jugular vein and to vertebrae in her neck and upper back.

¶11.    The Grand Jury of Jefferson Davis County indicted Jones for one count of murder, in violation of Mississippi Code Annotated section 97-3-19 (Supp. 2017). Jones's trial was conducted over the course of three days, from October 10, 2016, to October 12, 2016. The jury heard testimony from Tabatha's oldest son, Daniel,[4] who was seven years old at the time of the shooting. Daniel testified that, on the morning of the incident, he heard his mother and Jones arguing. The arguing stopped for some time, then it resumed, and then Daniel heard three gunshots. Daniel indicated what the gunshots sounded like by knocking his fist against

---

[2] The State in its brief on appeal says that Tabatha indicated Jones shot her twice, while Jones does not purport either that Tabatha did or did not make such an indication. It is this Court's opinion that Tabatha's movements were not intelligible to the extent that we can definitively say she indicated Carlos shot her twice.

[3] Tabatha's autopsy was actually performed by Dr. Erin Barnhart, who was unavailable to testify at Jones's trial.

[4] The minor child's name has been changed to protect his privacy.

6

the ledge of the witness stand three times. While the record is unclear as to the exact timing pattern of Daniel's knocks, the State maintained during closing arguments that two of the knocks were closer together than the third, which differs from an episode of rapid fire, during which all shots would have occurred in quick succession with no variance in timing between them. Jones's counsel did not refute the State's recollection of Daniel's knocks against the witness stand, but instead argued that Daniel was incorrect in remembering the timing pattern of the shots or that he had been coached prior to his testimony.

¶12. Investigator Johnson also testified at trial, during which the video of his interview with Tabatha at the hospital was admitted into evidence. Jones's defense counsel objected on the basis that the video was more prejudicial than probative. The court allowed the video into evidence on the basis that it was a part of Investigator Johnson's continuing investigation. Investigator Johnson further testified as to his investigative report, wherein he recounted the following:

> [Jones] stated that he had the gun under the pillow and he accidentally shot his wife, and he also told Officer Marshall the same thing.
>
> * * * *
>
> Mr. Jones stated that the gun was under the pillow and Tab[ath]a was complaining about it[,] so he took the gun from under the pillow and put it in his back pocket, and the gun fell out [of] his pocket and hit the floor[. H]e stated that Tab[ath]a stated[, "Y]ou need to put that gun up[."] Mr. Jones stated that he pick[ed] the gun up and was trying to show her that it wasn't loaded, and the gun went off[,] shooting her in the neck[,] both shoulder[s], and chest.

¶13. Two witnesses testified about the handgun's functionality: Darrell Carey, a firearms

7

instructor who testified for the defense, and Carl Fullilove, a forensic scientist who testified for the State. After conducting a voir dire examination of Carey, the trial court refused to admit him as an expert under Rule 702 of the Mississippi Rules of Evidence, on the basis that he had not shown that his testimony was "based on sufficient facts or data" or "based on reliable principles and methods." Specifically, the trial judge noted that Carey had not produced written documentation or publication that could be cross-examined by counsel opposite, and that "his testimony was strongly weighted or heavily weighted toward firearm shooting and not the mechanics of the firearm itself, i.e., the assembling, disassembling, [or] the methodology of how it operates." Jones's counsel argued that Carey's testimony was relevant because a theory of its case was that "if you hold the weapon without a rigid wrist, . . . due to the weight of the slide, . . . when you fire the weapon, you can get basically a repetitive firing, very, very rapidly." As Carey was experienced in shooting handguns, the defense argued that he was an expert and should be able to testify as such. However, the court ultimately refused to allow Carey to testify as an expert, and allowed him to testify only as to his personal observations as a lay witness.

¶14. Carey, as a lay witness, testified that he attempted to recreate Jones's theory of defense: that he had picked up the gun and it somehow discharged several times. A video recording of this recreation is included in the record. Carey testified to the following:

> It [did] not occur with every pick up of the firearm, but what I did observe is that if you grasp that firearm . . . like this (indicating) with that finger on that trigger . . . and that weight of that firearm basically weighs against your hand, it will go off several times in quick succession.

8

Carey further noted that he had personally observed that, on one occasion, when he lifted the gun up, "the heavy weight of [the] slide (indicating) basically cause[d] the firearm to bump against [my] trigger finger." Carey testified that once, as he lifted up the gun, it "actually went off twice, and then there was a second time where it actually went off three times without me consciously pulling the trigger. Just the weight of that slide (indicating) reciprocating back and forth caused it to continue firing."

¶15. Fullilove, as an expert witness for the State, testified that, like Carey, he had fired Jones's gun to ascertain its functionality. Fullilove testified that he conducted several tests to see if the gun would misfire, even using a rawhide hammer to strike the weapon. Fullilove opined that, to fire the weapon, a person would have had to pull the trigger once per shot.

¶16. At the conclusion of trial, the jury found Jones guilty of second-degree murder. He was sentenced to forty years in the custody of the Mississippi Department of Corrections, with thirty-five years to serve. Jones filed a timely motion for judgment notwithstanding the verdict, which was denied. Jones now appeals his conviction.

DISCUSSION

I.    *Admission of the Video*

¶17. Jones argues that the trial court's admission of Investigator Johnson's video of Tabatha at the hospital violated his fundamental rights under the Sixth Amendment's Confrontation Clause. Jones concedes that his counsel did not properly object, but maintains that this issue may proceed under the doctrine of plain error. The State, in response, argues

9

(1) that the issue is waived due to Jones's failure to properly object, and (2) even assessing the issue under plain error, "the admission of the video is not grounds for reversal because the statements that Tabatha made on the video were cumulative of other evidence that was admitted at trial, including the admissions that Jones, himself, made."

¶18. First, we note that regardless of whether Jones's counsel objected, we may proceed with this analysis under the plain-error doctrine. "Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's 'fundamental, substantive right.'" *Smith v. State*, 986 So. 2d 290, 294 (¶10) (Miss. 2008). "A Confrontation Clause violation is a violation of a 'fundamental, substantive right.'" *Bufford v. State*, 191 So. 3d 755, 760 (¶18) (Miss. Ct. App. 2015) (quoting *Ezell v. State*, 132 So. 3d 611, 612 (¶3) (Miss. Ct. App. 2013)). Thus, this issue is proper for our review even though it may not have been properly preserved for appeal.

¶19. "The Confrontation Clause guarantees a criminal defendant the right 'to be confronted with the witnesses against him.'" *Id*. at 759 (¶13) (quoting U.S. Const. amend. VI). "In *Crawford v. Washington*, 541 U.S. 36[, 54] (2004), the United States Supreme Court held that 'testimonial' evidence could not be admitted against a criminal defendant unless the declarant was unavailable at trial, and the defendant had a prior opportunity to cross-examine him." *Id*. (citation omitted). The Supreme Court provided in *Michigan v. Bryant*, 562 U.S. 344, 370 (2011), that, when determining whether a statement is testimonial and therefore barred by the Confrontation Clause, "it should determine the 'primary purpose of the

10

interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." The Court held:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. at 356 (citing *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

¶20.    We hold that the video was, under this standard, testimonial. Investigator Johnson asked Tabatha two questions: (1) whether Jones shot her and (2) how many times he shot her. We see no purpose for those questions other than to establish events potentially relevant to Jones's later criminal prosecution. Further, we note that Tabatha was unavailable to testify at trial due to her unfortunate death, and that Jones had no opportunity to cross-examine her.

¶21.    However, while we find that the circuit court erred in admitting the video, we also find that Jones was not prejudiced by this violation. The Supreme Court has held that "[a] defendant is entitled to a fair trial but not a perfect one," and that, therefore, "most constitutional errors can be harmless." In *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), the Supreme Court provided the following with respect to when Confrontation-Clause violations may be considered harmless error:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination [was] fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily

11

accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

¶22. Under these parameters, we are satisfied that the trial court's error in admitting the video was harmless beyond a reasonable doubt. First, we note that Tabatha's testimony was not particularly beneficial to either the State or Jones. Tabatha was unable to provide definite answers to either of Investigator Johnson's questions, as she appeared to be only semi-conscious when she lifted her hand or moved her fingers. Second, the evidence was cumulative, at least with respect to Investigator Johnson's question of whether Jones shot Tabatha, as Jones, himself, admitted that he was in control of the gun when Tabatha was shot. Third, we cannot say that there was evidence corroborating or contradicting Tabatha's testimony on material points, because she made no material points, as her nonverbal communication was ambiguous at best. As discussed earlier in this opinion, there was sufficient admissible and credible evidence upon which the jury could rely to convict Jones without considering Tabatha's nonverbal ambiguous communication about who shot her. Based on these facts, we hold that, while admission of the video was erroneous due to its testimonial nature, the error was harmless.

II.    *Expert Witness*

¶23. Jones argues that the trial court erred in failing to admit Carey as an expert witness in the field of firearm operations and functions, which consequently prejudiced his right to

12

present his defense that the shooting was accidental. In response, the State contends that the trial court did not err, because Carey did not disclose "what his expert opinion would be, as was required by URCCC 9.04(c)(3),"[5] and because Jones did not show that Carey satisfied the requirements for admission of expert testimony under the Mississippi Rules of Evidence. Further, the State maintains that Jones never made a proffer of what Carey's testimony would have been, had he been qualified as an expert, rendering the record insufficient for us to determine whether the trial court's refusal of his expert testimony was reversible error. Finally, the State maintains that the trial court did not deny Jones the opportunity to present his theory of defense, in part because Carey's purported testimony and personal observations did not prove that Tabatha's death was accidental.

¶24. "The standard of review regarding admission or exclusion of evidence is abuse of discretion." *Tillis v. State*, 176 So. 3d 37, 45 (¶15) (Miss. Ct. App. 2014). Rule 702 of the Mississippi Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

---

[5] We note that the Uniform Rules of Circuit and County Court relating to criminal practice have been supplanted by the Mississippi Rules of Criminal Procedure, effective July 1, 2017. Because the former rules were still in effect during Jones's trial, Rule 9.04(c)(3) applies to Jones's case. The same applies to any other former rules cited in this opinion.

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

In contrast, Rule 701 of the Mississippi Rules of Evidence provides that a lay witness may testify as to his opinion if that opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

¶25.    We do not find that the trial court abused its discretion in allowing Carey to testify as a lay witness, but not as an expert.  As previously stated, the trial judge found that Carey's testimony was not "based on sufficient facts and data," because it concerned firearm shooting and not the actual mechanics of the firearm.  Further, the trial judge held that Carey could not offer any "reliable principles or method[s] that could be cross-examined by the opposite counsel," such as written reports or other documentation, or any published materials.

¶26.    The record supports these conclusions: Carey admitted that he had never written any articles or periodicals on shooting firearms, and could not provide the court with any "reliable principles and methods" on which his testimony was based.  Further, Carey did not hold an engineering degree and did not seek to testify as to the gun's mechanics.  Such knowledge probably would have been more akin to relevant expert testimony in this case, which revolved around the gun's mechanical propensity to misfire.  Carey's testimony, as

14

presented during the voir dire examination, was largely contingent upon his own personal observations of the handgun's functionality, in light of Jones's theory of defense. As such, we hold that he was properly allowed to testify as a lay witness, only. We decline to address the State's other arguments regarding Carey's testimony, as they are consequently moot.

### III. Sufficiency of Counsel

¶27. Jones argues that his counsel was constitutionally ineffective because he failed to offer an accident instruction which would have allowed the jury to consider his theory of defense. In response, the State maintains that Jones's counsel's decision was trial strategy and, therefore, not subject to review.

¶28. To prove ineffective assistance of counsel, a party must show (1) that his counsel's performance was deficient and (2) that this deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). However, we have repeatedly held that:

> [T]he merits of an ineffective-assistance-of-counsel claim on direct appeal should be addressed only when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.

*Robinson v. State*, 68 So. 3d 721, 723 (¶10) (Miss. Ct. App. 2011) (internal quotation marks omitted). Here, the record does not affirmatively show ineffectiveness of constitutional dimensions. Further, the parties have not stipulated that the record is adequate to allow this Court to make a finding without consideration of the trial judge's findings of fact. Thus, we dismiss with respect to this issue, without prejudice, so that Jones may properly seek leave

from the Mississippi Supreme Court to raise this issue in a post-conviction relief motion.

¶29. Although we found error in the trial court's admission of testimonial evidence, that error was harmless, particularly in light of the other evidence presented at trial. We note, specifically, that Jones offered varying accounts of the events that occurred just prior to the shooting. As stated above, Jones testified at trial that the gun "just went off" as he was lifting it from the ground. However, in his police statement, Jones said that the gun went off when he turned. Further, at trial, Jones maintained both that he did not know how he retrieved the gun, and that he did not pull the trigger on the gun. Such a statement belies McClendon's testimony that Jones told him he and Tabatha had been "playing," when he shot her due to the gun's "hair trigger." In light of these inconsistencies, combined with the testimony of all witnesses at trial, we affirm.

¶30. **AFFIRMED.**

**LEE, C.J., CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. GRIFFIS, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. BARNES, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**