# IN THE COURT OF APPEALS OF IOWA

No. 20-0327
Filed September 1, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**GARY CHARLES WOOD, JR.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, William P. Kelly (trial)

and David Porter (habitual-offender trial and sentencing), Judges.

        A defendant appeals his conviction and sentence for third-offense domestic

abuse assault, as a habitual offender.  **AFFIRMED.**

        John C. Heinicke of Kragnes & Associates, P.C., Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Linda J. Hines, Assistant Attorney

General, for appellee.

        Considered by Tabor, P.J., Greer, J., and Doyle, S.J.*

        * Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2021).

**TABOR, Presiding Judge.**

In late June 2019, Gary Wood struck his then live-in girlfriend, M.M., bruising her left eye. The State charged him with domestic abuse assault, third or subsequent offense, and as a habitual offender. *See* Iowa Code §§ 708.2A(4), 902.8 (2019). In a bifurcated trial, one jury convicted him of the domestic abuse assault; another jury found sufficient evidence supporting the two enhancements. From those verdicts, the district court sentenced Wood to a fifteen-year term of imprisonment with a mandatory minimum of five years.

Now Wood asks us to reverse his conviction and order a new trial. He claims the court erred in finding he forfeited his right to object to M.M.'s statements under the Confrontation Clause. He also asserts the State offered insufficient evidence that he (1) acted without justification in committing the assault and (2) had prior convictions qualifying him for either enhancement. And if we uphold his conviction, Wood asserts the court erred in sentencing him to a mandatory minimum of five years under Iowa's habitual-offender statute.

Because the record shows Wood procured M.M.'s unavailability, we affirm the admissibility of M.M.'s statements. We also find the State offered sufficient proof of the domestic abuse assault and the recidivism enhancements. And after reviewing the sentencing statutes, we affirm the mandatory-minimum term.

## I. Facts and Prior Proceedings

On June 30, M.M. called 911 from her apartment "screaming for help." She told the dispatcher Wood "was making his way into her house" and she was afraid "he was going to kill her." While relaying that information, she saw Wood break in

through a window and stab her son's friend[1] with a screwdriver. When officers arrived, they secured Wood in the back of a patrol car.

During their investigation, Officers Mitchell Froehle and Dustin Wing noticed M.M.'s black eye. When they asked about her injury, M.M. said Wood "struck her in the face" during an argument on June 24. M.M. explained she did not report the assault "out of fear" from Wood's warning—"he was willing to catch that number-one." She understood that to mean "he was willing to take a murder-one charge." Wood instructed her "to tell her coworkers that she was assaulted by two unknown males near where she worked." Based on that conversation, police arrested Wood for domestic abuse assault causing bodily injury. The district court then issued a no-contact order protecting M.M.

In August 2019, the State charged Wood with third-offense domestic abuse assault. The trial information alleged Wood had twice before been convicted of domestic abuse assault: once in September 2018 and once in June 2019. In an amended trial information, the State added a habitual-offender enhancement based on 2003 and 2015 felony convictions.

While awaiting trial in jail, Wood violated the no-contact order more than thirty times by communicating with M.M. through text messages, phone calls, and virtual visits, according to the State's complaints. The State asked the district court "to restrict [Wood's] avenues of communications" because he allegedly was threatening her not to come to trial. The State also moved for a preliminary ruling on the admissibility of evidence, including the 911 call, jail recordings, and M.M.'s

---

[1] Police later learned from M.M.'s son that he sent his friend to his mother's apartment to protect her from Wood, believing her life was in danger.

statements to police implicating Wood. *See* Iowa R. Evid. 5.104(a). The motion stated: "[M.M.] has since minimized the allegation of abuse and has become uncooperative due to [Wood's] manipulation through his jail communication in violation of the No Contact Order." Besides arguing hearsay exceptions, the State claimed Wood forfeited his right to object under the Confrontation Clause because he intimidated her into not testifying against him.

On the first day of trial, the district court held an evidentiary hearing to address the State's forfeiture-by-wrongdoing claim. Investigator Kim Smith of the Polk County Attorney's Office recounted her many attempts to serve M.M. with a subpoena the week before. Smith could not find M.M. at her residence or the convenience store where she worked. The investigator called and left messages, but received no response. The investigator eventually left the subpoena in her door and a note in her mailbox asking her to call. She did not respond. And despite Smith personally serving M.M. with the subpoena on the day before trial, M.M. failed to appear at the courthouse for trial. Based on his interactions with M.M. and Wood, Officer Froehle believed it was "[i]ntimidation and fear" that prevented M.M. from cooperating with the prosecution.

Also as evidence of Wood's wrongdoing, the State offered ten recorded jail conversations between him and M.M. from July and October. After reviewing those recordings, the district court agreed: "Wood intended to prevent . . . [M.M.] from testifying through manipulation, control, threats, and the use of language, in violating the no-contact order to accomplish that goal." Because he caused M.M.'s absence, the court ruled Wood forfeited his right to raise confrontation objections to the use of her statements during trial.

Still, the State had other evidentiary hurdles in admitting that evidence. The defense acknowledged M.M.'s statements "directly implicating [Wood] on the 24th of June as the person who caused the black eye" were unobjectionable under the forfeiture ruling. But the defense argued all other statements, including "statements about how he has done this to her in the past, terrorized her in the past," or "told her subsequently what story to tell" should be excluded as unfairly prejudicial and improper character evidence. *See* Iowa Rs. Evid. 5.403, .404. The defense also resisted admission of the 911 call and jail recordings as irrelevant.

In the end, the district court found M.M.'s statements that Wood assaulted her on June 24, that he expressed his willingness to face a murder charge, and that he told her to fabricate a story were all admissible. As for the various recordings, the court allowed the jury to hear a redacted version of the 911 call and one jail recording as evidence of Wood's consciousness of guilt.

The jury found Wood guilty of domestic abuse assault. A different jury determined Wood was the same person who had been convicted of domestic abuse assault on two prior occasions and a habitual offender. Relying on those enhancements, the district court ordered Wood to serve a mandatory minimum of five years of a fifteen-year prison term. Wood appeals.

## II. Scope and Standards of Review

In resolving Wood's claims, we apply three standards of review. First, we review his forfeiture-by-wrongdoing claim de novo because it involves the loss of his constitutional right to confront his accuser.[2] *See State v. Hallum*, 606 N.W.2d

---

[2] At trial, Wood raised both hearsay and confrontation objections to the admission of M.M.'s statement to police that he had assaulted her on June 24. The district

351, 354 (Iowa 2000). Under that standard, we conduct an independent review of the entire record but "give weight to the district court's findings of fact." *Id.*

Second, we review his sufficiency challenges for correction of legal error. *State v. Banes*, 910 N.W.2d 634, 637 (Iowa Ct. App. 2018). We will uphold the verdicts if substantial evidence supports them. *Id.* We find substantial evidence when the quantity and quality of evidence could persuade a rational jury that the defendant is guilty beyond a reasonable doubt. *Id.* In reaching that determination, we view "the evidence in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.*

Third, both parties contend we review the sentencing decision for an abuse of discretion. But because Wood challenges his five-year mandatory minimum, we review for correction of legal error under the sentencing-enhancement statutes. *See State v. Dailey*, 774 N.W.2d 316, 317 (Iowa Ct. App. 2009) (applying this standard when deciding whether district court could impose staggered sentence under statutes governing repeat offenders); *see also State v. Sanford*, No. 11-0581, 2013 WL 264644, at *1 (Iowa Ct. App. Jan. 24, 2013) (assessing whether sentence was illegal under sentencing-enhancement provision for third-offense domestic abuse assault). We ask whether "the challenged sentence complies with the relevant statutes." *Sanford*, 2013 WL 264644, at *1 (citing *Dailey*, 774 N.W.2d at 317).

---

court overruled those objections. On appeal, Wood does not challenge the ruling on hearsay grounds, which we would review for errors of law. *See State v. Paulson*, No. 17-1668, 2019 WL 1486395, at *2 n.2 (Iowa Ct. App. Apr. 3, 2019). Rather, he claims the court erred in admitting that out-of-court statement based on "the forfeiture of [his] Sixth Amendment right to confront his accuser."

## III. Analysis

### A. Forfeiture by Wrongdoing

The Sixth Amendment safeguards the accused's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. That clause precludes "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). But we need not decide whether M.M.'s statements were testimonial or nontestimonial. Neither party raises that issue on appeal. Instead, they focus on this exception: "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis v. Washington*, 547 U.S. 813, 833 (2006). This exception often arises in domestic violence prosecutions because those cases are "notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial." *Id.*

Wood argues the district court erred in finding he forfeited his right to confrontation because his conduct did "not rise to the level of interfering with [M.M.'s] willingness to testify at trial." He suggests the State needed to prove he took "affirmative steps" to prevent her from testifying.

In resistance, the State points to the 911 call and recorded jail phone calls as sufficient evidence that M.M. failed to appear because "[she] knew that Wood posed a danger to her and the people about whom she cared, and he made it clear he did not want her to show up at his trial." The State points to Wood's pattern of conduct, including threats and acts of violence intended to control M.M.

Under the forfeiture-by-wrongdoing exception, the State had to prove by a preponderance of the evidence that Wood "wrongfully procured the witness's unavailability." *See Hallum*, 606 N.W.2d at 355–56. That procurement may happen not only through "the use of threats, force or intimidation" but also by persuasion and control. *Id.* at 356. "Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help [is] highly relevant to this inquiry . . . ." *Giles v. California*, 554 U.S. 353, 377 (2008).

The State met that burden of proof. Viewing the history of Wood's relationship with M.M., we find sufficient evidence that Wood employed threats and levers of control to dissuade her from cooperating with the prosecution. According to Officer Froehle, M.M. appeared "terrified" when he responded to her frantic 911 call on June 30. He documented the bruising on her left eye. Both M.M. and a neighbor identified Wood as the perpetrator. The neighbor corroborated M.M.'s statement that she sustained the injury on June 24 while arguing with Wood. Despite her injury, M.M. declined to report the abuse because she believed Wood would retaliate with murder. That belief manifested in her statement to dispatch that she feared "he was going to kill her." And it explained why M.M.'s son was concerned for his mother's safety. So much so that he asked his friend to stay with her as a form of protection.

Beyond instilling fear through his prior conduct, Wood repeatedly violated his no-contact order while in jail to keep tabs on M.M. Sergeant Elizabeth Swanson reported that Wood made over thirty prohibited outbound calls by borrowing "the phone account from several different inmates in his housing unit." She described Wood's demeanor as "controlling." The recorded conversations captured Wood

"telling [M.M.] to be quiet, be quiet, shut up, listen to me, I'll see you in court, I'll see you in court." He also commented: "If you show up to court, you have no credibility." Then on October 6, M.M. insinuated she would be seeing him in court. Wood responded, "No, no, you can't." He added, "That's the day of the trial."

We consider Wood's menacing tone and veiled threats in those jail calls, together with his prior violence, in finding the State proved the forfeiture-by-wrongdoing exception. Wood intended to exploit both her fear and her lingering feelings for him to prevent M.M. from testifying at trial. As the district court noted, "He took advantage of her willingness to be in a relationship with him. You could tell from the latter calls how excited she was to see him again." Sergeant Swanson expressed a similar view: "they would be happy with each other and then you would see extreme anger between them." *See Hallum*, 606 N.W.2d at 358 (noting change in victim's attitude toward defendant after exchanging letters showed effects of influence). Because he intended to prevent M.M. from showing up at court and she did fail to appear, Wood forfeited his right to object to admission of her prior statements.[3] *See State v. Harper*, 770 N.W.2d 316, 322 (Iowa 2009).

---

[3] In a related appeal, *State v. Wood*, No. 20-0614, 2021 WL _____, (Iowa Ct. App. _____. ___, 2021), another panel of our court decided the State did not offer substantial evidence to support Wood's conviction for suborning perjury in connection with the domestic-abuse trial. We recognize it may appear inconsistent to hold the State proved that Wood wrongfully procured M.M.'s unavailability for trial, while also deciding the State did not prove that Wood "procured or offered an inducement" to make M.M. "conceal material facts known to her." *Wood*, 2021 WL _____, at *___. But two key differences exist between these cases. First, the State presented different evidence on the confrontation issue here than at the prosecution for suborning perjury. Second, the evidence is judged under different standards. The State could prove forfeiture-by-wrong-doing by a preponderance of the evidence. The State's burden for the separate criminal offense was proof beyond a reasonable doubt.

**B. Sufficiency of the Evidence**

Wood next challenges the sufficiency of the evidence supporting his domestic-abuse-assault conviction and both the third-offense and habitual-offender enhancements. We will address each claim in turn.

**1. Domestic Abuse Assault**

For the jury to convict Wood of domestic abuse assault, the State had to prove these elements beyond a reasonable doubt:

> 1. On or about the 24th day of June, 2019, Gary Wood, Jr. specifically intended to do an act, without justification, which was meant to cause pain or injury, result in physical contact which was insulting or offensive, or place [M.M] in fear of immediate contact which would have been painful, injurious, insulting or offensive to [M.M.].
> 2. [Wood] had the apparent ability to do the act.
> 3. The act occurred between family or household members who
> a. Resided together within the last year but did not reside together at the time of the assault
> OR
> b. Who resided together at the time of the assault.

Wood does not dispute elements two and three. Rather, he contests the first element, claiming insufficient evidence to show he acted "without justification." He criticizes the testimony from Officers Froehle and Wing as "woefully deficient" because neither described the circumstances surrounding how M.M. sustained her black eye. In other words, even if he did strike his girlfriend, Wood asserts the State needed to prove "specifically whether it was without justification."

The State counters that justification is an affirmative defense, and not an element of the crime, despite the language in the jury instruction. Reframing the issue, the State claims its burden was to prove Wood's conduct met the elements of assault in Iowa Code section 708.1(2).

Indeed, our supreme court has long rejected Wood's position. *See State v. Delay*, 320 N.W.2d 831, 833 (Iowa 1982). Although the code defines assault as an act done "without justification," the State is not required "to negate an affirmative defense unless the defendant meets his initial burden by producing sufficient evidence that the defense applies." *Id.* at 834. So the inclusion of that phrase in the instruction did not shift the burden of proving justification to the State. Because Wood did not timely raise the affirmative defense or offer any evidence he acted with justification, the State satisfied the first element by showing he had the specific intent to do an act causing injury or harm to M.M.[4] Thus, we uphold his conviction.

### 2. Prior Convictions

Turning to the enhancements, Wood argues the State failed to adequately prove he was the same person convicted of domestic-abuse assault in 2018 and 2019 and of the felonies in 2003 and 2015. He claims the jury could not link him to those prior crimes without knowing "[his] date of birth and social security number that [he] used for the case at bar" and without a positive in-person identification that he was "one and the same person" as the "Gary Charles Wood Jr." convicted in the other cases. We disagree.

Even without the details of his personal information or a witness identification based on his appearance in court, a jury could reasonably conclude Wood was the same person convicted of those prior offenses. The State acknowledges "identity of names—standing alone—is insufficient to establish identity of persons" for recidivism enhancements. *State v. Sanborn*, 564 N.W.2d

---

[4] Despite filing a reply brief, Wood does not argue he lacked the requisite intent.

813, 815 (Iowa 1997). But the jury did more than match names. For instance, the State offered as exhibits two written guilty pleas for domestic abuse assault under Wood's full name. The Polk County clerk of court verified the birth date and social security number on those records. Both convictions listed M.M. as the victim. Officer Froehle corroborated the clerk's testimony by identifying Wood as the same person he investigated for domestic abuse assault against M.M. in 2018. He confirmed the social security number and birth date given by Wood matched the 2019 conviction. "A reasonable jury could infer from this testimony that the match resulted, not from mere identity of names, but from a correlation with the other data as well." *Id.* at 816.

The record also supported the jury's habitual-offender verdict. The State's exhibits included a written guilty plea and sentencing order for two felony convictions. The name, social security number, and birth date were the same. Officer Froehle said he obtained Wood's personal information through his investigation on June 30 and confirmed it matched the prior records. What's more, a probation officer prepared photographs of Wood from the earlier cases. When the prosecutor asked: "Do you see that man in the courtroom today?" The probation officer said, "Yes, I do." On this record, the State met its burden of proving the enhancements beyond a reasonable doubt. *See State v. Jordan*, 663 N.W.2d 877, 882 (Iowa 2003).

## C. Sentencing

Finally, Wood asserts the district court applied the wrong statute in determining his mandatory-minimum sentence. According to Wood, "since the State elected to add the habitual offender enhancement to the [d]omestic [a]buse

[a]ssault [t]hird or [s]ubsequent [o]ffense, the mandatory minimum sentence applicable to [that] enhancement should apply instead of the mandatory minimum found in Iowa Code section 902.13."

Section 902.8 governs sentencing for habitual offenders. That provision states: "A person sentenced as a habitual offender shall not be eligible for parole until the person has served the minimum sentence of confinement of three years." Iowa Code § 902.8. But rather than rely on the habitual-offender statute, the district court sentenced Wood to a five-year minimum under section 902.13.[5]

In choosing the mandatory minimum for third-offense domestic abuse assault, the court explained:

> [Counsel], to avoid any ambiguity in this sentence, I will not impose or check the box for the three year habitual offender. What I want to avoid, simply put, is for someone asking—or seeking clarification as to whether the court wanted to impose a three year term or five year term. I believe by imposing the five year mandatory minimum that should address the three year mandatory minimum concern.

Despite that explanation, the sentencing order reflects two checked boxes—a five-year mandatory minimum under section 902.13 and a three-year mandatory minimum under section 902.8.

In addressing that discrepancy, the State contends the five-year term "subsumes" the three-year term. Resisting that contention, Wood asserts "there is

---

[5] That provision imposes a different mandatory-minimum requirement:
> A person who has been convicted of a third or subsequent offense of domestic abuse assault under section 708.2A, subsection 4, shall be denied parole or work release until the person has served between one-fifth of the maximum term and the maximum term of the person's sentence as provided in subsection 2.

Iowa Code § 902.13(1).

no indication that the legislature intended that one statute is subsumed into the other statute." But Wood fails to provide a reason why the court would have to impose the shorter sentence.

As the State points out, we have recognized longer penalties subsume the three-year minimum of section 902.8. *See State v. Ross*, 729 N.W.2d 806, 808 (Iowa 2007) (upholding two fifteen-year mandatory minimums imposed under section 902.12 despite habitual-offender enhancement); *State v. Burgs*, 479 N.W.2d 323, 324 (Iowa 1992) (rejecting argument "that because section 902.11 makes no mention of the [habitual-offender] status, the legislature must have intended that habitual offenders escape the statute's stiffer penalty"). Under that line of cases, the district court properly found the five-year minimum covered both enhancements. We find no error in the sentencing decision.

**AFFIRMED.**